**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| PATRICK R. WILDA, individually, and as independent administrator of the ESTATE OF PATRICK C. WILDA, deceased, | ) ) ) ) ) | |
| Plaintiff, | ) ) | Case No. 16-cv-10088 |
| v. | ) ) | Hon. Steven C. Seeger |
| JLG INDUSTRIES, INC., | ) ) | |
| Defendant. | ) ) | |
| JLG INDUSTRIES, INC., | ) ) | |
| Third-Party Plaintiff, | ) ) | |
| v. | ) ) | |
| ILLINI HI-REACH, INC., | ) ) | |
| Third-Party Defendant. | ) ) | |
| ILLINI HI-REACH, INC., | ) ) | |
| Third-Party Plaintiff, | ) ) | |
| v. | ) ) | |
| AREA ERECTORS, INC., | ) ) | |
| Third-Party Defendant. | ) ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

This case involves a dispute about who will pay for a construction accident. Patrick C. Wilda suffered fatal injuries while working on a manlift to build a roof. His estate sued the manufacturer of the manlift, JLG Industries, for wrongful death and survival. JLG then filed a

Third-Party Complaint against Illini Hi-Reach, the distributor of the manlift. Illini Hi-Reach, in turn, filed a Third-Party Complaint of its own against Area Erectors, the employer of the decedent.

The parties filed four motions for summary judgment. JLG and Illini Hi-Reach filed cross motions for summary judgment, and so did Illini Hi-Reach and Area Erectors. Each pair of motions involves a dispute about an indemnification provision in their respective contracts. JLG seeks indemnification from Illini Hi-Reach, and Illini Hi-Reach seeks indemnification from Area Erectors.

The Court concludes that JLG is entitled to indemnification from Illini Hi-Reach under their agreement, and thus grants JLG's motion for summary judgment and denies Illini Hi-Reach's motion for summary judgment against JLG. The Court denies the cross motions for summary judgment filed by Illini Hi-Reach and Area Erectors. Illini Hi-Reach relies on an indemnification provision in their agreement, but there is a genuine issue of material fact about whether Area Erectors ever received the second page of the contract with the indemnification provision. A jury needs to decide whether Area Erectors received a copy of the page with the indemnification provision.

### Background

Patrick Wilda was an ironworker for Area Erectors, a construction company. *See* Illini Hi-Reach's Resp. to Area Erectors's Amended Rule 56.1(a)(3) Statement of Undisputed Material Facts, at ¶ 5 (Dckt. No. 222); JLG's Resp. to Illini Hi-Reach's Statement of Material Facts, at ¶ 2 (Dckt. No. 216); *see also* Area Erectors, Inc., https://www.areaerectors.com (last visited July 1, 2020) (describing itself as a "structural steel and precast concrete erection service[]"). Wilda started working for the company in September 2014 at its construction site in Wilmington,

Illinois. *See* Illini Hi-Reach's Resp. to Area Erectors's Amended Rule 56.1(a)(3) Statement of Undisputed Material Facts, at ¶ 6 (Dckt. No. 222).

The accident took place while Wilda was working on a manlift. As the name suggests, a manlift is a "self-propelled hydraulic personnel lift equipped with a work platform on the end of an elevating and rotating boom." *See* Illini Hi-Reach's Resp. to JLG's Additional Statement of Material Facts, at ¶ 17 (Dckt. No. 229).

JLG manufactured the manlift in question. *See id.* at ¶ 14; Illini Hi-Reach's Resp. to Area Erectors's Amended Rule 56.1(a)(3) Statement of Undisputed Material Facts, at ¶ 1 (Dckt. No. 222). JLG delivered the manlift to Illini Hi-Reach, one of its distributors. *See* Illini Hi-Reach's Resp. to Area Erectors's Amended Rule 56.1(a)(3) Statement of Undisputed Material Facts, at ¶ 2 (Dckt. No. 222); Illini Hi-Reach's Resp. to JLG's Additional Statement of Material Facts, at ¶¶ 14–15 (Dckt. No. 229). Illini Hi-Reach is a rental business that rents and sells aerial lift equipment. *See* JLG's Resp. to Illini Hi-Reach's Statement of Material Facts, at ¶ 4 (Dckt. No. 216); Area Erectors's Resp. to Illini Hi-Reach's Rule 56.1 Statement of Additional Material Facts, at ¶ 4 (Dckt. No. 234). The two companies have a long-running business relationship. Illini Hi-Reach became a distributor of JLG equipment in 2000. *See* JLG's Resp. to Illini Hi-Reach's Statement of Material Facts, at ¶ 17 (Dckt. No. 216); Illini Hi-Reach's Resp. to JLG's Additional Statement of Material Facts, at ¶ 2 (Dckt. No. 229).

JLG and Illini Hi-Reach entered into a rental purchase option agreement (the "RPO Agreement") for the manlift at issue.[1] *See* JLG's Resp. to Illini Hi-Reach's Statement of

---

[1] JLG and Illini Hi-Reach call their agreement the "Rental Purchase Option Agreement," or the "RPO Agreement," even though the contract seems to be called a "Rental Out" Agreement. *See* Dckt. No. 49-2; Dckt. No. 218-10. Still, Illini Hi-Reach and Area Erectors entered into a contract, too, and they call their agreement the "Rental Out" Agreement. So, in the interest of clarity, the Court will adopt the parties' terminology. The agreement between JLG and Illini Hi-Reach is the "RPO Agreement," and the agreement between Illini Hi-Reach and Area Erectors is the "Rental Out Agreement."

Material Facts, at ¶ 5 (Dckt. No. 216); Illini Hi-Reach's Resp. to JLG's Additional Statement of Material Facts, at ¶¶ 8–9 (Dckt. No. 229). The agreement included an indemnification provision that required Illini Hi-Reach to indemnify and defend JLG for certain damages arising from the manlift. *See* Illini Hi-Reach's Resp. to JLG's Additional Statement of Material Facts, at ¶ 11 (Dckt. No. 229); RPO Agreement, at 2 (Dckt. No. 49-2).

Illini Hi-Reach, in turn, rented the manlift to Area Erectors to use at its Wilmington jobsite. *See* JLG's Resp. to Illini Hi-Reach's Statement of Material Facts, at ¶ 3 (Dckt. No. 216); Area Erectors's Resp. to Illini Hi-Reach's Rule 56.1 Statement of Additional Material Facts, at ¶ 3 (Dckt. No. 234). Illini Hi-Reach delivered the manlift to the construction site on September 26, 2014, shortly after Wilda joined Area Erectors. *See* Illini Hi-Reach's Resp. to Area Erectors's Amended Rule 56.1(a)(3) Statement of Undisputed Material Facts, at ¶ 3 (Dckt. No. 222).

Wilda's accident took place on January 30, 2015. *Id.* at ¶¶ 11–12. The parties don't offer many details about what, exactly, happened. Wilda climbed aboard the manlift and elevated himself to the roof, where he needed to bolt together steel roof joists. *See* Illini Hi-Reach's Resp. to JLG's Additional Statement of Material Facts, at ¶ 80 (Dckt. No. 229); Area Erectors's Motion for Entry of Good Faith Finding, at 1–2 (Dckt. No. 150-4). He was alone. *See* Illini Hi-Reach's Resp. to JLG's Additional Statement of Material Facts, at ¶ 80 (Dckt. No. 229).

Disaster struck. Wilda became pinned between a roof joist and the manlift's control panel. *Id.* He suffered fatal injuries. *See* Area Erectors's Motion for Entry of Good Faith Finding, at 2 (Dckt. No. 150-4); *see also* Illini Hi-Reach's Resp. to Area Erectors's Amended Rule 56.1(a)(3) Statement of Undisputed Material Facts, at ¶ 12 (Dckt. No. 222). No one

witnessed the accident. *See* Illini Hi-Reach's Resp. to JLG's Additional Statement of Material Facts, at ¶ 80 (Dckt. No. 229).

Wilda's estate filed a wrongful death and survival suit against a number of defendants, including JLG, in the Circuit Court of Cook County. *See* Illini Hi-Reach's Resp. to Area Erectors's Amended Rule 56.1(a)(3) Statement of Undisputed Material Facts, at ¶¶ 13–15 (Dckt. No. 222). The estate sued JLG for its role in manufacturing and designing an allegedly defective manlift. *Id.* at ¶ 14. Three of the other named defendants – Ridge Lego Partners, LLC, Ledcor Construction, Inc., and Construction Systems – filed a Third-Party Complaint against Area Erectors as Wilda's employer. *Id.* at ¶ 15.

The parties went to mediation and settled almost all of Wilda's claims. *Id.* at ¶ 16. JLG was the only party that did not join the settlement. *Id.* at ¶ 17.

As part of the settlement agreement, Wilda's estate agreed to release Ridge Lego Partners, Ledcor Construction, Construction Systems, and third-party defendant Area Erectors for a total of $600,000. *Id.* at ¶¶ 18–19; Release and Settlement Agreement, at 2 (Dckt. No. 150-3). Area Erectors agreed to pay $240,000 of that amount to settle any claims by Wilda's estate. *See* Illini Hi-Reach's Resp. to Area Erectors's Amended Rule 56.1(a)(3) Statement of Undisputed Material Facts, at ¶ 19 (Dckt. No. 222). Area Erectors agreed to waive its workers' compensation lien, too. *Id.* Area Erectors also paid $160,000 to settle the third-party claims by Ridge Lego Partners, Ledcor Construction, and Construction Systems. *Id.* at ¶ 20.

After the settlement, Area Erectors filed a motion for an entry of good faith under the Illinois Joint Tortfeasor Contribution Act in state court. *Id.* at ¶ 21. The Act creates a statutory right to contribution when more than two parties are liable for "the same injury to person or property, or the same wrongful death." *See* 740 ILCS 100/2. The Act also shields any tortfeasor

who settles such a claim in good faith "from all liability for any contribution to any other tortfeasor." *See* 740 ILCS 100/2(d). Area Erectors argued that its $400,000 payment and the waiver of its workers' compensation lien was evidence of a good faith settlement, and that the Circuit Court should dismiss the company "from any contribution action against it." *See* Area Erectors's Motion for Entry of Good Faith Finding, at 3, 5 (Dckt. No. 150-4).

On October 26, 2016, the Circuit Court of Cook County dismissed Area Erectors and the three other settling defendants. *See* Illini Hi-Reach's Resp. to Area Erectors's Amended Rule 56.1(a)(3) Statement of Undisputed Material Facts, at ¶ 22 (Dckt. No. 222); *see also* Dismissal Order dated 10/26/16 (Dckt. No. 1-5). The state court found that the settlement was "entered into in good faith pursuant to the provisions of the Illinois Joint Tortfeasor Contribution Act." *See* Dismissal Order dated 10/26/16, at ¶ 1 (Dckt. No. 1-5). At that point, JLG was the last remaining defendant. *See* Illini Hi-Reach's Resp. to Area Erectors's Amended Rule 56.1(a)(3) Statement of Undisputed Material Facts, at ¶ 23 (Dckt. No. 222).

JLG removed this case to federal court the very next day based on the diversity of citizenship.[2] *Id.* at ¶ 24; *see also* Notice of Removal (Dckt. No. 1). A few months later, Wilda's estate filed a Petition to Approve Settlement (Dckt. No. 30), even though the state court had already approved the proposed settlement.[3] Judge Lee, the District Court Judge assigned to this case before reassignment, granted the motion. *See* Order dated 1/10/2017 (Dckt. No. 33).

---

[2] The caption of the Petition to Approve Settlement (Dckt. No. 30) filed in this federal suit includes the three settling defendants as defendants, even though the state court already dismissed them. If they were parties at the time of removal, they would count for purposes of diversity jurisdiction. *See Tylka v. Gerber Prod. Co.*, 211 F.3d 445, 448 (7th Cir. 2000); *see also Trujillo v. American Bar Ass'n*, 706 Fed. App'x 868, 871 (7th Cir. 2017). But the Dismissal Order by the state court expressly dismissed Wilda's claims against those three defendants with prejudice. *See* Dismissal Order dated 10/26/16, at ¶ 2 (Dckt. No. 1-5). So there was no apparent reason to list non-parties in the caption.

[3] For some reason, Wilda's estate filed the Petition to Approve Settlement (Dckt. No. 30) in federal court, even though the state court already dismissed the three settling defendants: (1) Ridge Legal Partners,

JLG was the last defendant standing, but it soon added others to the fold. *See* Order dated 1/12/2017 (Dckt. No. 34). JLG filed a Third-Party Complaint against Illini Hi-Reach, the company that rented the equipment to Area Erectors. *See* JLG's Third-Party Cplt. (Dckt. No. 49). JLG seeks indemnification under its contract with Illini Hi-Reach. *See id.* at ¶¶ 5–15. In the alternative, JLG seeks contribution under the Illinois Contribution Act. *Id.* at ¶¶ 16–20.

Illini Hi-Reach, in turn, later filed a Third-Party Complaint against Area Erectors. *See* Illini Hi-Reach's Am. Third-Party Cplt. (Dckt. No. 137). Illini Hi-Reach claims that its contract with Area Erectors (called the "Rental Out Agreement") requires Area Erectors to indemnify and defend it for the claims advanced by Wilda's estate. *See id.* at ¶ 23; *see also* Area Erectors's Resp. to Illini Hi-Reach's Rule 56.1 Statement of Additional Material Facts, at ¶ 45 (Dckt. No. 234).

The Rental Out Agreement between Illini Hi-Reach and Area Erectors includes an indemnification provision on the second page. As things stand, one of the main issues is whether Area Erectors ever received the second page of the Rental Out Agreement (meaning the back side of a single-sheet document).

The driver who delivered the manlift for Illini Hi-Reach was supposed to leave a copy of the Rental Out Agreement with someone from Area Erectors. *See* Area Erectors's Resp. to Illini Hi-Reach's Rule 56.1 Statement of Additional Material Facts, at ¶ 8 (Dckt. No. 234).[4] Its

---

LLC; (2) Ledcor Construction, Inc.; and (3) Construction Systems, Inc. The state court found that the settlement was "entered into in good faith pursuant to the provisions of the Illinois Joint Tortfeasor Contribution Act." *See* Dismissal Order dated 10/26/16, at ¶ 1 (Dckt. No. 1-5). So it is unclear why Wilda's estate sought approval from the federal court, too. Perhaps the parties wanted the Court to approve a specific distribution of the settlement proceeds, but it is unclear why the parties needed the Court's blessing.

[4] Although Area Erectors denies this statement – along with several others – the company doesn't support its denial with evidence of its own. *See* Area Erectors's Resp. to Illini Hi-Reach's Rule 56.1 Statement of Additional Material Facts, at ¶¶ 5–8, 10, 11, 15, 19, 26, 45, 48–49 (Dckt. No. 234). Local Rule 56.1(b)(3)(B) requires the non-moving party to provide "references to the affidavits, parts of the record,

practice was to obtain a signature on the Rental Out Agreement "from someone who is employed by the rentor," too. *Id.* at ¶ 10.

Louis Roon, the Illini Hi-Reach driver who delivered the manlift to Area Erectors, does not remember the delivery. *See* Illini Hi-Reach's Resp. to Area Erectors's Amended Rule 56.1(a)(3) Statement of Additional Facts, at ¶ 41 (Dckt. No. 249). But there is evidence suggesting that it occurred. There is a signature on behalf of the customer (Area Erectors) on the agreement. *See* Rental Out Agreement, at 1 (Dckt. No. 137-2). Unfortunately, the signature doesn't clear up much, because there is a dispute about who signed it. *See* Illini Hi-Reach's Rule 56.1 Statement of Additional Material Facts, at ¶¶ 24–25 (Dckt. No. 221); Area Erectors's Resp. to Illini Hi-Reach's Rule 56.1 Statement of Additional Material Facts, at ¶¶ 24–25 (Dckt. No. 234); Illini Hi-Reach's Resp. to Area Erectors's Amended Rule 56.1(a)(3) Statement of Additional Facts, at ¶¶ 38–39, 42–43 (Dckt. No. 249). Illini Hi-Reach suggests that Kevin Podobinski, one of Area Erectors's welders, signed it. *See* Illini Hi-Reach Rule 56.1 Statement of Additional Material Facts, at ¶ 24 (Dckt. No. 221). That position is consistent with the signature itself (but it is not perfectly legible). Still, Podobinski testified that it was not his signature. *See* Podobinski Dep. 33:14-20 (Dckt. No. 232-6).

After delivery, there was another opportunity for Area Erectors to receive the terms and conditions, including the indemnification provision. When Illini Hi-Reach sends its first monthly bill to the customer, the invoice consists of a "two-sided document and contains the same terms and conditions on the back side as on the Rental Out Agreement." *See* Illini Hi-Reach's Rule 56.1 Statement of Additional Material Facts, at ¶ 14 (Dckt. No. 221). So, if the driver doesn't receive the customer's signature upon delivery, Illini Hi-Reach will send the terms

---

and other supporting materials relied upon." *See* Local Rule 56.1(b)(3)(B). A statement of disagreement, without more, does not create a disputed question of fact. *See* Fed. R. Civ. P. 56(c).

and conditions with the customer's first invoice. *Id.* at ¶ 15. But Area Erectors offers evidence that it received no such thing. Area Erectors points out that, instead of a two-sided document, it received a one-sided invoice without the terms and conditions of the Rental Out Agreement. *See* Area Erectors's Rule 56.1(a)(3) Additional Facts, at ¶ 47 (Dckt. No. 237); *see also* 10/16/2014 Illini Hi-Reach Invoice (Dckt. No. 234-1).

After extensive discovery, the parties later filed cross motions for summary judgment about the indemnification provision in the agreements. Basically, the questions are whether Illini Hi-Reach must indemnify JLG, and whether Area Erectors must indemnify Illini Hi-Reach.

### Legal Standard

Rule 56 provides that the Court "shall grant" summary judgment when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute about a material fact exists if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law controls which facts are material. *Id.* After a "properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 250 (internal quotations omitted).

The Court "'consider[s] all of the evidence in the record in the light most favorable to the non-moving party, and [ ] draw[s] all reasonable inferences from that evidence in favor of the party opposing summary judgment.'" *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (citation omitted). The Court gives the non-moving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in [its] favor." *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "The controlling

question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id.*

When parties file cross motions for summary judgment, the Court treats the motions "separately in determining whether judgment should be entered in accordance with Rule 56." *Marcatante v. City of Chicago*, 657 F.3d 433, 439 (7th Cir. 2011). The Court construes all facts and draws all reasonable inferences in favor of the party against whom the motion was filed. *Indianapolis Airport Auth. v. Travelers Prop. Cas. Co. of Am.*, 849 F.3d 355, 361 (7th Cir. 2017); *see also Kreg Therapeutics, Inc. v. VitalGo, Inc.*, 919 F.3d 405, 416 (7th Cir. 2019) ("Each cross movant for summary judgment bears a respective burden to show no issue of material fact with respect to the claim.").

## Analysis

The parties filed a pair of cross motions for summary judgment. The first pair involves JLG and Illini Hi-Reach, and the second pair involves Illini Hi-Reach and Area Erectors.

JLG and Illini Hi-Reach filed cross motions for summary judgment on both counts of JLG's Third-Party Complaint. *See* Dckt. Nos. 178, 217. In Count I, JLG seeks indemnification from Illini Hi-Reach (payable to JLG Service Plus, an affiliate of JLG) for any liability stemming from the accident. *See* JLG Third-Party Cplt. ¶¶ 5–15 (Dckt. No. 49). JLG seeks defense costs, too. *Id.* at ¶¶ 11–12. In Count II, in the alternative, JLG seeks contribution from Illini Hi-Reach for any damages. *Id.* at ¶¶ 16–20.

Illini Hi-Reach and Area Erectors also filed cross motions for summary judgment under Illini Hi-Reach's Third-Party Complaint. *See* Dckt. Nos. 147, 202. Illini Hi-Reach doesn't break out its claims into separate counts. But it seeks indemnification and defense costs from Area Erectors for any liability arising from Wilda's accident. *See* Illini Hi-Reach's Third-Party

10

Cplt. ¶ 23 (Dckt. No. 137). Illini Hi-Reach also claims that Area Erectors was required to maintain liability insurance that covered both companies. *Id.* at ¶ 25.

Only Area Erectors discusses choice of law in its brief (and only in passing). *See* Area Erectors's S.J. Brf., at 2 (Dckt. No.149). The company concludes that Illinois law governs. *Id.* JLG and Illini Hi-Reach do not discuss choice of law in their briefs, but they take it as a given that Illinois law applies. *See generally* Illini Hi-Reach's S.J. Brf. (Dckt. No. 179); Illini Hi-Reach's S.J. Brf. (Dckt. No. 220); JLG's Am. S.J. Brf. (Dckt. No. 317). The Court does not need to delve deeply into choice of law when the parties are on the same page about what law governs. *See Bowers v. Fed'n Internationale de l'Automble,* 489 F.3d 316, 324 n.4 (7th Cir. 2007); *Speakers of Sport, Inc. v. ProServ, Inc.*, 178 F.3d 862, 864 (7th Cir. 1999) ("The parties agree that the substantive issues in this diversity suit are governed by Illinois law, and we do not look behind such agreements so long as they are reasonable[.]"); *Christopoulos v. Trout*, 343 F. Supp. 3d 812, 817 n.3 (N.D. Ill. 2018) ("[T]he court need not conduct a choice of law analysis because the parties have not conducted one or advocated for applicability of the law of a state other than Illinois, resulting in waiver of choice of law."). So the Court, too, applies Illinois law.

## I.   JLG's Indemnification Claim against Illini Hi-Reach (Count I)

JLG and Illini Hi-Reach each moved for summary judgment on JLG's indemnification claim (Count I). The parties agree that they entered into a contract (again, the RPO Agreement) for JLG to rent or sell equipment to Illini Hi-Reach. *See* Illini Hi-Reach's Statement of Undisputed Facts, at ¶¶ 5, 7–8 (Dckt. No. 180); JLG's Additional Statement of Material Facts, at ¶¶ 4–6 (Dckt. No. 218). The RPO Agreement includes a provision requiring Illini Hi-Reach to indemnify JLG, and the question is whether it covers the claims brought by Wilda's estate against JLG. It does.

11

### A.     Coverage of Wilda's Claims Against JLG

The gist of the dispute is whether the indemnification provision covers claims by Wilda's estate about JLG's design of the manlift.  Illini Hi-Reach's primary argument is that the indemnity provision of the RPO Agreement is ambiguous and should be construed in its favor.  According to Illini Hi-Reach, the agreement "fails to clearly and explicitly state that Illini Hi-Reach has agreed to indemnify JLG for JLG's own strict liability and negligence."  *See* Illini Hi-Reach's S.J. Brf., at 2 (Dckt. No. 179).  But that's exactly what the agreement says.

The interpretation of a contract is a question of law.  *U.S. ex rel. Garbe v. Kmart Corp.*, 824 F.3d 632, 645 (7th Cir. 2016); *Hanover Ins. Co. v. N. Bldg. Co.*, 751 F.3d 788, 791 (7th Cir. 2014).  "Because contracts are interpreted as a matter of law, claims that turn on the interpretation and construction of a contract, rather than on disputed material facts, are suitable for resolution on a motion for summary judgment."  *W. Bend. Mut. Ins. Co. v. Procaccio Painting & Drywall Co.*, 928 F. Supp. 2d 976, 981 (N.D. Ill. 2013), *aff'd on other grounds*, 794 F.3d 666 (7th Cir. 2015).  If the contract is unambiguous, then the plain text controls, and that is the end of the matter.  *See Right Field Rooftops, LLC v. Chicago Cubs Baseball Club, LLC*, 870 F.3d 682, 690 (7th Cir. 2017) (quoting *Gallagher v. Lenart*, 226 Ill. 2d 208, 233, 314 Ill. Dec. 133, 874 N.E.2d 43 (2007)) ("A court must initially look to the language of a contract alone, as the language, given its plain and ordinary meaning, is the best indication of the parties' intent."); *Utility Audit, Inc. v. Horace Mann Serv. Corp.*, 383 F.3d 683, 687 (7th Cir. 2004) ("Under Illinois law, . . . contract terms are interpreted according to their plain meaning unless otherwise defined."); *Kallman  v. Radioshack Corp.*, 315 F.3d 731, 735 (7th Cir. 2002) (quoting *Church v. General Motors Corp.*, 74 F.3d 795, 799 (7th Cir. 1996)) ("If the language [of the contract] unambiguously answers the question at issue, the inquiry is over.").

When the parties dispute the meaning of a provision, "the threshold issue is whether the contract is ambiguous." *Bright Horizons Children's Ctrs., LLC v. Riverway Midwest II, LLC*, 403 Ill. App. 3d 234, 247, 341 Ill. Dec. 883, 931 N.E.2d 780 (2010). Illinois courts apply the "four corners rule," meaning that a court should look only at the contract's language to determine if an ambiguity exists. *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill. 2d 457, 463, 236 Ill. Dec. 8, 706 N.E.2d 882 (1999). A contract is ambiguous if it is "susceptible to more than one meaning or is obscure in meaning through indefiniteness of expression." *Bright Horizons Children's Ctrs.*, 403 Ill. App. 3d at 247 (cleaned up). A contract is not ambiguous, however, just because the parties disagree about what it means. *Id.*; *see also Thompson v. Gordon*, 241 Ill. 2d 428, 443, 349 Ill. Dec. 936, 948 N.E.2d 39 (2011). Extrinsic evidence matters only if a provision is ambiguous. *Air Safety*, 185 Ill. 2d at 462–63.

The RPO Agreement between JLG and Illini Hi-Reach includes a "Customer's Indemnification" provision. *See* RPO Agreement, at 2 (Dckt. No. 49-2). The clause provides that Illini Hi-Reach (the Customer) will indemnify JLG ServicePlus (a JLG affiliate) for a wide range of potential claims. The text includes a lot of expansive language, and not a lot of exclusions:

> Customer agrees to reimburse, indemnify, hold harmless and defend, at Customer's expense, ServicePlus, its subsidiaries, parent companies, affiliate companies, and their agents, officers, directors and employees, against all losses, liabilities, damages, injuries, penalties, including, without limitations [sic], bodily injury, death, property damage or other damage arising out of any breach of this Agreement, Customer's violation of any applicable regulations, improper use, possession, operation, erection, dismantling, servicing, or transport involving the Equipment, Customer's contamination of the Equipment by any party, strict liability or negligence or failure to discover a defect, or incurred by ServicePlus in any manner from this transaction, including claims of or liabilities to third parties. Customer agrees to present a claim to its insurance carrier for all such amounts and in the event Customer has no

13

> insurance to cover such amounts, Customer agrees to pay
> ServicePlus for such amounts.

*Id.*

The language is a bit of a mouthful. The use of a run-on sentence, with imperfect punctuation and without any subheadings, will probably force most readers to give it a second or third look. It covers a long laundry list of potential claims, some of which might seem to blur together. To help the reader, and make things easy, the Court will place brackets around language that the Court reads as subparts. The Court reads the language as follows:

> Customer agrees to reimburse, indemnify, hold harmless and defend, at Customer's expense, ServicePlus, its subsidiaries, parent companies, affiliate companies, and their agents, officers, directors and employees, against all losses, liabilities, damages, injuries, penalties, including, without limitations [sic], bodily injury, death, property damage or other damage[,] arising out of [1] any breach of this Agreement, [2] Customer's violation of any applicable regulations, [3] improper use, possession, operation, erection, dismantling, servicing, or transport involving the Equipment, [4] Customer's contamination of the Equipment by any party, [5] strict liability or negligence or failure to discover a defect, or [6] incurred by ServicePlus in any manner from this transaction, including claims of or liabilities to third parties. Customer agrees to present a claim to its insurance carrier for all such amounts and in the event Customer has no insurance to cover such amounts, Customer agrees to pay ServicePlus for such amounts.

*Id.*[5] Another option is to read the phrase "arising out of" to be part of the first subpart, rather than a phrase that precedes and thus limits all of the subparts. Like this:

> Customer agrees to reimburse, indemnify, hold harmless and defend, at Customer's expense, ServicePlus, its subsidiaries, parent companies, affiliate companies, and their agents, officers, directors and employees, against all losses, liabilities, damages, injuries, penalties, including, without limitations [sic], [1] bodily injury,

---

[5] The contract does not include a comma after "damage." Still, the Court reads "including, without limitations [sic], bodily injury, death, property damage or other damage" as one complete phrase. That is, Illini Hi-Reach agreed to indemnify JLG "against all losses, liabilities, damages, injuries, penalties, including . . . arising out of" the six subparts that followed. Again, this Court's ruling does not depend on the existence of an implied comma. The key point is that it covers "strict liability or negligence."

14

> death, property damage or other damage arising out of any breach of this Agreement, [2] Customer's violation of any applicable regulations, [3] improper use, possession, operation, erection, dismantling, servicing, or transport involving the Equipment, [4] Customer's contamination of the Equipment by any party, [5] strict liability or negligence or failure to discover a defect, or [6] incurred by ServicePlus in any manner from this transaction, including claims of or liabilities to third parties. Customer agrees to present a claim to its insurance carrier for all such amounts and in the event Customer has no insurance to cover such amounts, Customer agrees to pay ServicePlus for such amounts.

*Id.* The latter reading is more expansive. If the list after "without limitations" is truly a list of non-exhaustive illustrations, then the language could essentially stop after "penalties." In that case, the provision would cover pretty much any liability, even if it wasn't tied to this transaction. Even so, the Court's holding does not turn on where the subparts begin and end – the Court flags the point simply to make the language more comprehensible for the reader.

Illini Hi-Reach does not point to any particular word or phrase that is ambiguous. For example, it doesn't argue that Word X could mean either "Y" or "Z." Instead, it offers a rule of construction about how to interpret indemnification contracts, based on three Illinois state court cases. Illini Hi-Reach puts forward what amounts to a clear-statement rule. It argues that "unless the terms of the indemnity clause clearly provide that a sub-contractor is to assume the risk of negligent manufacture . . . the indemnity clause should not be construed to include such a risk." *See* Illini Hi-Reach's S.J. Brf., at 8 (Dckt. No. 179) (quoting *Mesker Bros. Iron Co. v. Des Lauriers Column Mould Co.*, 8 Ill. App. 3d 113, 116, 289 N.E.2d 223 (1972)). But relying on cases construing other indemnification provisions is a delicate enterprise. The Illinois Supreme Court has forewarned that it "serves no useful purpose to attempt to analyze or reconcile the numerous cases interpreting indemnity clauses since each individual case depends upon the particular language used and the factual setting of the case." *Buenz v. Frontline Transp. Co.*, 227 Ill. 2d 302, 310–11, 317 Ill. Dec. 645, 882 N.E.2d 525 (2008) (cleaned up).

A rule of construction doesn't help Illini Hi-Reach's cause because the agreement contains sweeping language. Illini Hi-Reach agreed to indemnify JLG for "all" losses, "all" liabilities, and "all" damages "arising out of" an enumerated list of potential claims. *See* RPO Agreement, at 2 (Dckt. No. 49-2). The agreement expressly covers "strict liability or negligence." *Id.* It also covers all losses "incurred by [JLG] in any manner from this transaction, including claims of or liabilities to third parties." *Id.* The contract reaches damages from "bodily injury" and "death," too. *Id.*

The claims brought by Wilda fit comfortably within the wide boundaries of the agreement. The Third Amended Complaint includes claims against JLG for strict liability (Counts XIX, XXI) and negligence (Counts XX, XXII). *See* Third Am. Cplt. (Dckt. No. 1-2). Illini Hi-Reach agreed to indemnify JLG for all losses involving "strict liability or negligence." *See* RPO Agreement, at 2 (Dckt. No. 49-2). So the claims in question fall squarely within the indemnification provision. If anything, they are right down Main Street.

Illini Hi-Reach argues that it has "no obligation to indemnify JLG for the plaintiff's strict liability and negligence claims against it." *See* Illini Hi-Reach's S.J. Brf., at 3 (Dckt. No. 179). But the agreement says the opposite. Illini Hi-Reach expressly agreed to indemnify JLG for losses stemming from "strict liability or negligence." *See* RPO Agreement, at 2 (Dckt. No. 49-2).

Illini Hi-Reach's clear-statement rule (even if it applied) does not help because the agreement is, in fact, clear and unambiguous. An agreement covering "all" losses for negligence includes a claim for negligent manufacturing and negligent design. *Id.* The latter is a subset of the former; the general category ("negligence") covers different *types* of negligence. Also, an agreement covering losses arising "in any manner" from the transaction covers the entire

16

waterfront of potential claims. *Id.* Losses arising "in any manner" means losses arising in *any* manner from the transaction. And here, the losses arose from the rental of the equipment because the equipment was later involved in the accident.

Illini Hi-Reach tries to shrink the boundaries of the indemnification provision, arguing that it never agreed to indemnify JLG for the design of the manlift. *See* Illini Hi-Reach's S.J. Brf., at 8–9 (Dckt. No. 179). As Illini Hi-Reach reads it, the indemnification provision "contemplates the use of the lift, not the manufacturer's own design of the lift." *Id.* at 9.

That's not what the agreement says. If anything, the text suggests the opposite. The indemnification provision expressly covers any claims about the "improper use" of the manlift. *See* RPO Agreement, at 2 (Dckt. No. 49-2). But the text doesn't stop there. It embraces other types of claims, including "strict liability or negligence." *Id.* Not merely negligence relating to the improper *use* of the manlift. Negligence, period. There's no carve-out for claims about design, and there's no provision limiting indemnification to claims about use.

The fact that the agreement lists other types of covered claims – above and beyond claims about improper use – confirms that the agreement is not confined to claims about improper use. And the fact that the agreement covers "negligence" (without more) confirms that it covers negligence, period. The structure and the text of the indemnification provision pull in the same direction.

Illini Hi-Reach protests that it played no role in the design of the manlift. *See* Illini Hi-Reach's S.J. Brf., at 9 (Dckt. No. 179). Maybe so, but it makes no difference. The parties agreed to an allocation of potential liabilities. JLG agreed to rent equipment to Illini Hi-Reach, provided that Illini Hi-Reach would be responsible for any losses. Excluding claims about design after the fact would change the terms of the deal.

17

The Illinois Supreme Court addressed an expansive indemnification provision in *Buenz v. Frontline Transportation Co.*, 227 Ill. 2d 302, 317 Ill. Dec. 645, 882 N.E.2d 525 (2008). The indemnification provision included broad language, and the parties disputed whether it covered claims about defendant COSCO's own negligence. The agreement itself included no such carve-out:

> [Frontline] shall indemnify [COSCO] against, and hold [COSCO] harmless for any and all claims, demands, actions, suits, proceedings, costs, expenses, damages, and liability, including without limitation attorney's fees, arising out of, [in] connection with, or resulting from the possession, use, operation, or returning of the equipment during all periods when the equipment shall be out of the possession of [COSCO].

*Id.* at 306.

The Illinois Supreme Court held that the text meant what it said. The agreement used sweeping language, and thus swept in a wide array of potential claims. The language didn't include an exclusion for claims about COSCO's own negligence, so it covered claims about COSCO's own negligence. "This contract contains no limiting language to suggest that the indemnity provided is not intended to cover claims resulting from COSCO's own negligence." *Id.* at 317–18. The court emphasized that the "agreement is very broad and, considering its common unambiguous meaning, encompasses even claims which arise out of COSCO's negligence." *Id.* at 318.

The same principle applies here. The RPO agreement includes a sweeping indemnification provision, and there is no carve-out for claims about JLG's design. Wilda brought strict liability and negligence claims against JLG, and the indemnification provision covers strict liability and negligence. The text includes no exclusions, and it means what it says.

The plain language of the contract entitles JLG to indemnification by Illini Hi-Reach. For some reason, JLG's brief makes a few unnecessary arguments in favor of indemnification.

JLG argues that Illini Hi-Reach designed and configured the manlift. JLG also argues that Illini Hi-Reach breached the RPO Agreement by failing to train Wilda and by failing to properly maintain the manlift. *See* JLG's Am. S.J. Brf., at 3–5, 10–14 (Dckt. No. 317).

JLG didn't need to make these arguments to support its claim for indemnification. The arguments seem more geared toward contribution, rather than indemnification, because they address whether Illini Hi-Reach was at fault in some way. That reading is consistent with JLG's Third-Party Complaint, which alleges that JLG is entitled to contribution because Illini Hi-Reach had a faulty design,[6] failed to train Wilda, and failed to inspect and maintain the manlift. *See* JLG's Third-Party Cplt. ¶¶ 16–18 (Dckt. No. 49).

First, JLG argues that it is entitled to indemnification because Illini Hi-Reach designed the manlift by selecting (or refusing) certain accessories. *See* JLG's Am. S.J. Brf., at 3–5 (Dckt. No. 317); *see id.* at 5 ("Illini decided the design and configuration of the Boom Lift. . . . As such, JLG must be indemnified by Illini for the claims against it."). The parties engage in a long-winded back-and-forth on the subject. *See id.* at 3–5; Illini Hi-Reach's Resp., at 5–9 (Dckt. No. 228); JLG's Reply, at 2, 6–9 (Dckt. No. 318). But it makes no difference. Nothing in the agreement says that Illini Hi-Reach has to indemnify JLG if Illini Hi-Reach designed the lift. The duty to indemnify does not depend on who designed the manlift.

Next, JLG argues that it is entitled to indemnification because Illini Hi-Reach breached the agreement by failing to train Wilda, and by failing to service the manlift. *See* JLG's Am. S.J. Brf., at 10–14 (Dckt. No. 317). Once again, the parties spill a barrel of ink on the subject. *See id.*; Illini Hi-Reach's Resp., at 10–12 (Dckt. No. 228); JLG's Reply, at 9–12 (Dckt. No. 318).

---

[6] It might seem odd to argue that Illini Hi-Reach – the company renting the equipment from the manufacturer – could be faulted for an improper design. Typically the manufacturer (here, JLG) designs what it is manufacturing. But here, the argument is that Illini Hi-Reach designed the manlift because it didn't select a certain safety accessory.

But it is neither here nor there. Illini Hi-Reach does not have a duty to indemnify JLG because Illini Hi-Reach breached some *other* contractual obligation. Instead, Illini Hi-Reach has a duty to indemnify JLG because that's what it agreed to do, full stop. The duty to indemnify does not depend on whether Illini Hi-Reach breached the contract some other way.

There is one lingering issue. In addition to a duty to indemnify, JLG argues that Illini Hi-Reach has a duty to defend JLG from the claims brought by Wilda. *See* JLG's Am. S.J. Brf., at 14–16 (Dckt. No. 317). Again, the indemnification clause of the RPO Agreement provides that Illini Hi-Reach "agrees to reimburse, indemnify, hold harmless and *defend* . . . [JLG] against all losses, liabilities, damages, injuries, penalties . . . ." RPO Agreement, at 2 (Dckt. No. 49-2) (emphasis added).

The duty to defend often arises in disputes between insurers and their insureds.[7] But Illini Hi-Reach is not an insurer, and Illinois courts recognize that "there is a fundamental difference between insurers and non-insurers." *See Dominick's Finer Foods, LLC v. Eurest Servs., Inc.*, 2015 IL App (1st) 150369-U, ¶ 36 (2015) (discussing *Ervin v. Sears, Roebuck and Co.*, 127 Ill. App. 3d 982, 82 Ill. Dec. 709, 469 N.E.2d 243 (1984)). Companies like Illini Hi-Reach lack the "specialized experience of providing insurance as an actual insurance company." *See id.* And insurance contracts are fundamentally different from contracts for the sale (or rental) of goods. "Unlike insurance contracts, the fundamental purpose of a contract to sell goods . . . is simply *to sell goods* . . . an activity that comes with its own set of obligations,

---

[7] In the insurance context, the duty to defend is broader than the duty to indemnify. *See Nat'l Cas. Co. v. Forge Indus. Staffing Inc*., 567 F.3d 871, 874 (7th Cir. 2009); *see also Keystone Consol. Indus., Inc. v. Emp'rs Ins. Co. of Wausau*, 456 F.3d 758, 762 (7th Cir. 2006) ("[A]lthough the duties to defend and to indemnify may be related, they are not necessarily mutually dependent or coextensive."). At least one Illinois case holds that the same principle applies to contractual indemnification, too. *See Jandrisits v. Vill. of River Grove*, 283 Ill. App. 3d 152, 157, 218 Ill. Dec. 640, 669 N.E.2d 1166 (1996). Here, the relationship between the duty to defend and the duty to indemnify makes little difference because the contract in question expressly requires both.

separate and apart from the obligations of an insurer." *Id.* (emphasis in original). What's more, courts liberally construe insurance policies in favor of the insured, but the deck is not stacked in favor of indemnification. If anything, Illinois courts strictly construe indemnification provisions in contracts. *See FHP Tectonics Corp. v. NES Rentals Holdings, Inc.*, 2016 IL App (1st) 141650-U, ¶ 81 (2016).

When the duty to defend arises from an indemnity agreement, the existence of that duty "is determined solely from the allegations of the complaint and the agreement." *Jandrisits*, 283 Ill. App. at 158. In the Third Amended Complaint, Wilda's estate brings four claims against JLG as the manufacturer. Counts XIX and XXI allege that JLG is strictly liable for, among other things, failing to design a safe product. *See* Third Am. Cplt., at 46–48, 51–53 (Dckt. No. 1-2). Counts XX and XXII assert the same claims under a negligence theory. *Id.* at 49–51, 53–55.

Illini Hi-Reach signed an agreement that requires it "to reimburse, indemnify, hold harmless and defend" JLG "against all losses, liabilities, damages, injuries, penalties," including "strict liability or negligence." *See* RPO Agreement, at 2 (Dckt. No. 49-2). The question is whether Illini Hi-Reach agreed to defend Area Erectors under ordinary contract principles, without the heightened standard that applies to insurers. *Dominick's Finer Foods*, 2015 IL App (1st) 150369-U, at ¶ 36.

The analysis is straightforward. Illini Hi-Reach agreed to "indemnify, hold harmless and defend" JLG against all losses for claims including "strict liability or negligence." *See* RPO Agreement, at 2 (Dckt. No. 49-2). Wilda sued JLG for strict liability and negligence. So Illini Hi-Reach has a duty to defend JLG. "[R]egardless of the events at trial, as long as the allegations in the pleadings potentially exposed [JLG] to liability, [Illini Hi-Reach] was obligated

to 'defend' [JLG]." *See McNiff v. Millard Maint. Serv. Co.*, 303 Ill. App. 3d 1074, 1081, 239 Ill. Dec. 802, 715 N.E.2d 247 (1999).

Illini Hi-Reach doesn't come to terms with the plain meaning of the text. Instead, it repeats the same arguments that it advanced against indemnification, such as the notion that the language is ambiguous. *See* Illini Hi-Reach's Resp., at 14 (Dckt. No. 228). There is nothing ambiguous about language stating that Illini Hi-Reach "agrees to reimburse, indemnify, hold harmless and defend, at Customer's expense," JLG. *See* RPO Agreement, at 2 (Dckt. No. 49-2).

In sum, the Court grants JLG's motion for summary judgment on Count I of its Third-Party Complaint, and denies Illini Hi-Reach's motion on that claim. Illini Hi-Reach has a duty to indemnify and defend JLG for the claims advanced by Wilda's estate.

## II.    JLG's Contribution Claim against Illini Hi-Reach (Count II)

JLG also seeks contribution from Illini Hi-Reach in Count II of its Third-Party Complaint. *See* JLG's Third-Party Cplt. ¶¶ 16–20 (Dckt. No. 49). JLG seeks contribution "as an alternate remedy," meaning as an alternative to its indemnification claim. *See* JLG's Am. S.J. Brf., at 16 (Dckt. No. 317). JLG agreed to drop its demand for contribution if this Court rules in its favor on the indemnification claim: "If JLG is awarded contractual indemnification against Illini for all claims in this lawsuit, then JLG has no objection to this Court dismissing its contribution claim." *Id.* at 16–17.

"The remedies of contribution and indemnity are mutually exclusive, and contribution is prohibited where a party has a right to indemnity." *Home Ins. Co. v. Cincinnati Ins. Co.*, 821 N.E.2d 269, 276 (Ill. 2004). This Court has ruled that Illini-Hi Reach owes indemnification to JLG, so there is no need for a contribution claim. Accordingly, this Court dismisses Count II of the Third-Party Complaint.

22

### III. Illini Hi-Reach's Indemnification Claim Against Area Erectors

Illini Hi-Reach and Area Erectors filed the second pair of cross motions for summary judgment. Those two parties, like JLG and Illini Hi-Reach, have a dispute about an indemnification provision in a contract. Illini Hi-Reach moves for summary judgment based on an indemnification provision in its Rental Out Agreement with Area Erectors. Area Erectors, in turn, makes four arguments against the enforceability of the Rental Out Agreement.

First, Area Erectors argues that Illini Hi-Reach cannot rely on the indemnification provision because of an earlier filing. Illini Hi-Reach attached a copy of the agreement to its Third-Party Complaint. That copy had a different second page, with a different indemnification provision, than the version of the contract that Illini Hi-Reach relies on now. Illini Hi-Reach later filed a corrected copy of the agreement. But Area Erectors views the original filing as a judicial admission. Area Erectors tries to pour concrete around the first-filed version. As Area Erectors sees it, Illini Hi-Reach is stuck with the first-filed version, and can't correct its mistake.

Second, Area Erectors argues that the Agreement is unenforceable under the statute of frauds because it lacks a signature by an authorized agent.

Third, Area Erectors claims that it is not bound by the second page of the Agreement because it never received a copy.

Fourth, Area Erectors argues that the Illinois Construction Contract Indemnification for Negligence Act forecloses a claim for indemnification by Illini Hi-Reach.

In addition to indemnification, Area Erectors also makes an argument about contribution. It suggests that it cannot be liable for contribution because it settled with Wilda's estate, and an Illinois statute bars contribution claims against defendants who settle in good faith.

The Court will address each argument in turn. The punchline is that the Court rejects the arguments by Area Erectors, save one. There is a genuine issue of material fact about whether Area Erectors ever received a copy of the second page of the Rental Out Agreement. So that issue requires a jury.

### A.    The Second Page of the Contract

The first question involves pinning down the second page of the contract. Illini Hi-Reach relies on an indemnification provision that appears on the second page of the Rental Out Agreement. But it is a different second page than the one that it originally filed. Area Erectors claims that Illini Hi-Reach made a judicial admission when it attached a different copy of the agreement to its Third-Party Complaint. As Area Erectors sees it, if that copy was a mistake, too bad, because Illini Hi-Reach is stuck with it forever.

At first glance, the record might seem a bit hazy. Area Erectors flashes a bunch of citations to deposition testimony, representing that witnesses testified that the first-filed version was right after all. But after close inspection, there is no genuine issue of material fact about which page was the right page. The undisputed evidence confirms that the first-filed version was a mistake. The old second page was wrong, and the new second page is right.

Illini Hi-Reach claims that the parties entered into a Rental Out Agreement when it rented the manlift to Area Erectors. *See* Illini Hi-Reach's Third Party Cplt. Against Area Erectors (Dckt. No. 72). That agreement was not new. Illini Hi-Reach used the same form contract for every piece of equipment that it rented to Area Erectors from 2008 to 2014. *Id.* at ¶ 11. According to the pleading, an employee or agent of Area Erectors signed the Rental Out Agreement when Illini Hi-Reach delivered the manlift. *Id.* at ¶ 13.

24

Illini Hi-Reach purported to attach to the Third-Party Complaint a "true and correct copy" of the Rental Out Agreement. *Id.* at ¶ 2. The purported Rental Out Agreement was two pages long (apparently it was one piece of paper, front and back). *See* Rental Out Agreement (Dckt. No. 72-2). The front page contained the general terms of the agreement, such as the specific machine rented by Area Erectors, the duration of the rental, and the cost. The back page contained additional terms and conditions. *Id.*

It was not a secret that additional terms and conditions appeared on the back page. In fact, the first page called attention to the additional provisions, right above the signature. "The above described Equipment has been received . . . and is accepted by CUSTOMER, subject to the terms and conditions on the reverse side hereof, which are hereby made a part hereof by reference as if fully set forth herein." *Id.* at 1; *see also* Rental Out Agreement, at 1 (Dckt. No. 137-2). For good measure, the agreement repeated the point, less than an inch above the signature line: "PLEASE READ THIS CONTRACT BEFORE SIGNING **NOTE: RENTAL AGREEMENT TERMS & CONDITIONS ON REVERSE SIDE. (CUSTOMER TO RETAIN COPY)." *See* Rental Out Agreement, at 1 (Dckt. No. 72-2).

The copy attached to the Third-Party Complaint contained an indemnification provision on the second page. That provision was identical to the indemnification provision in the agreement between JLG and Illini Hi-Reach. The provision stated:

> Customer agrees to reimburse, indemnify, hold harmless and defend, at Customer's expense, ServicePlus, its subsidiaries, parent companies, affiliate companies, and their agents, officers, directors and employees, against all losses, liabilities, damages, injuries, penalties, including, without limitations [sic], bodily injury, death, property damage or other damage arising out of any breach of this Agreement, Customer's violation of any applicable regulations, improper use, possession, operation, erection, dismantling, servicing, or transport involving the Equipment, Customer's contamination of the Equipment by any party, strict liability or

> negligence or failure to discover a defect, or incurred by ServicePlus in any manner from this transaction, including claims of or liabilities to third parties. Customer agrees to present a claim to its insurance carrier for all such amounts and in the event Customer has no insurance to cover such amounts, Customer agrees to pay ServicePlus for such amounts.

*Id.* In fact, the entire second page of the purported agreement between Illini Hi-Reach and Area Erectors (Dckt. No. 72-2) was identical to the second page of the agreement between JLG and Illini Hi-Reach (Dckt. No. 49-2).

Things quickly got messy. The Third-Party Complaint purported to quote the indemnification provision of the Rental Out Agreement. It quoted what was supposed to be paragraph 11 of the agreement: "11. **Indemnification, Risk of Loss, Insurance.** Customer shall indemnify Rentor against and hold Rentor harmless from any and all claims . . . ." *See* Illini Hi-Reach's Third Party Cplt. Against Area Erectors, at ¶ 23 (Dckt. No. 72).

That quotation was a clue that something was wrong. The copy attached to the Third-Party Complaint didn't include a paragraph 11. *See* Rental Out Agreement, at 2 (Dckt. No. 72-2). And the language was different, too. Again, the indemnification provision in the attached page began: "Customer agrees to reimburse, indemnify, hold harmless and defend, at Customer's expense, ServicePlus . . . ." *See* Rental Out Agreement, at 2 (Dckt. No. 72-2).

There is a more basic problem. The provision in the attached page required the Customer (Area Erectors) to reimburse "ServicePlus," not Illini Hi-Reach. *Id.* ServicePlus is a subsidiary of JLG (the manufacturer). Why would Area Erectors agree to indemnify *JLG* when it entered into a contract with Illini Hi-Reach? Wouldn't it make more sense for Area Erectors to agree to indemnify Illini Hi-Reach, given that Illini Hi-Reach is the other party to the contract? And how could Illini Hi-Reach take advantage of a provision requiring indemnification of *JLG*, not Illini

26

Hi-Reach?  Why would Illini Hi-Reach sue under an indemnification provision when the provision covers someone else?

The page in question contained lots of other textual clues that it did not fit in a contract between Illini Hi-Reach and Area Erectors.  There were many references to JLG (that is, ServicePlus), a non-party to the agreement.  For example, "Rentals are F.O.B. JLG Equipment Services Inc.'s d.b.a. Service Plus,[] branch."  *Id.* (extra comma omitted).  Placement of the equipment "at ServicePlus' branch" constituted "transfer of all risk of loss to Customer."  *Id.* The Customer – again, Area Erectors – agreed to "pay ServicePlus, on demand, all rental time, mileage, service . . . ."  *Id.*  ServicePlus was entitled to a lien against the Customer for late payments.  *Id.*  The Customer "represents and warrants to ServicePlus that any person operating the Equipment has been fully trained and qualified in the proper safe use thereof."  *Id.*  And so on.

It would be odd to include so many references to JLG when JLG wasn't a party to the contract between Illini Hi-Reach and Area Erectors.  And it would be strange to omit any reference to Illini Hi-Reach, one of the parties.  If that page were the right second page (meaning the second page attached to an agreement between Illini Hi-Reach and Area Erectors), then the "Customer" would be Area Erectors, and there would be no reference to Illini Hi-Reach at all.

At some point, Illini Hi-Reach figured out that there was a problem.  It filed a motion to substitute exhibits, claiming that it mistakenly filed the wrong second page.  *See* Dckt. No. 113. According to the motion, the second page of the original-filed version was the second page of the contract between JLG and Illini Hi-Reach, not the second page of the contract between Illini Hi-Reach and Area Erectors.  *Id.* at ¶ 4.

Judge Lee granted the motion, and gave Illini Hi-Reach leave to file an amended complaint. *See* Order dated 8/14/18 (Dckt. No. 136). Judge Lee foreshadowed that Illini Hi-Reach might oppose Area Erectors's motion for summary judgment by relying on the later-filed version: "So it seems to me that on the motion for summary judgment, in opposition to Area Erectors's motion for summary judgment, Illini Hi-Reach can try to create an issue of material fact by citing to Mr. Grey's deposition and saying, look, right, there is an issue of material fact as to what was in the back side of this document." *See* 8/14/18 Tr., at 10 (Dckt. No. 364).

Illini Hi-Reach then filed an amended pleading and attached a second, corrected copy of the Rental Out Agreement. *See* Illini Hi-Reach Am. Third Party Cplt. (Dckt. No. 137); Rental Out Agreement (Dckt. No. 137-2). It included a different second page. This time, the copy of the Rental Out Agreement contained an indemnification provision that matched the language quoted in the pleading (that is, it contained paragraph 11). *See* Rental Out Agreement, at 2 (Dckt. No. 137-2).

In its motion for summary judgment, Illini Hi-Reach relies on the indemnification provision in the second version of the Rental Out Agreement. *See* Illini Hi-Reach's S.J. Brf., at 18–19 (Dckt. No. 220). The paragraph begins with the following language:

> 11. **Indemnification, Risk of Loss, Insurance.** Customer shall indemnify Rentor against and hold Rentor harmless from any and all claims, actions, damages (including reasonable attorney's fees and expenses), obligations, liabilities and liens (including any of the foregoing arising or imposed without Rentor's fault or negligence, or under the doctrine of "strict liability"), arising out of the lease, possession, operation, condition, return or use of Equipment or by operation of law. . . . Customer shall bear all risk of loss to or arising from or related to the Equipment or the use, possession or operation thereof including, without limitation, bodily injury and death, and Customer shall procure property damage insurance against all risks from every cause whatsoever . . . .

28

*See* Rental Out Agreement, at 2 (Dckt. No. 137-2). Illini Hi-Reach argues that this provision requires Area Erectors to provide indemnification and defense costs related to the accident. *See* Illini Hi-Reach's S.J. Brf., at 8–12 (Dckt. No. 220).

Out of the gate, Area Erectors attempts to take advantage of the fact that Illini Hi-Reach is relying on the second version of the agreement, not the first-filed version. *See generally* Area Erectors's S.J. Brf., at 20–21 (Dckt. No. 149). Area Erectors thinks that the filing of the original version was a judicial admission, and that Illini Hi-Reach is bound forever to the original version. As Area Erectors sees it, Illini Hi-Reach is out of luck.

The Court finds that attaching the wrong exhibit is not a judicial admission. In general, "judicial admissions are formal concessions in the pleadings . . . that are binding upon the party making them," and thus judicial admissions "have the effect of withdrawing a fact from contention." *Keller v. United States*, 58 F.3d 1194, 1198 n.8 (7th Cir. 1995). The doctrine has its place. But it is not a vehicle for playing gotcha, either. Abruptly declaring that there is a judicial admission – especially when there is an apparent mistake – would interfere with the overriding truth-seeking function of litigation. A number of considerations come into play in litigation, but finding the truth is at the top of the list.

Even if attaching the wrong exhibit was a judicial admission, the Court has the discretion to relieve a party of a judicial admission. "A judicial admission is conclusive, unless the court allows it to be withdrawn." *Id.*; *see also Solon v. Gary Cmty. Sch. Corp.*, 180 F.3d 844, 858 (7th Cir. 1999); *Mopex, Inc. v. Barclays Glob. Inv'rs, N.A.*, 2003 WL 880996, at *2 (N.D. Ill. 2003). "[A] court, unquestionably, has the right to relieve a party of his judicial admission if it appears that the admitted fact is clearly untrue and that the party was laboring under a mistake when he made the admission." *McCaskill v. SCI Mgmt. Corp.*, 298 F.3d 677, 681-82 (7th Cir. 2002)

29

(Rovner, J., concurring) (quoting *New Amsterdam Cas. Co. v. Waller*, 323 F.2d 20, 24 (4th Cir. 1963)).  The Court will not foreclose Illini Hi-Reach from correcting a mistake.

Judicial admissions also cut both ways.  In its answer to the original Third-Party Complaint, Area Erectors denied that the attached copy – meaning the copy with the wrong page – was a true and correct copy of the Rental Out Agreement.  *See* Area Erectors's Answer to Illini Hi-Reach's Third Party Cplt., at ¶¶ 2, 22 (Dckt. No. 79).  If anything, that statement is a stronger admission than what Illini Hi-Reach did.  Illini Hi-Reach attached a wrong page, but Area Erectors typed out text and made a statement of its own.  But now, Area Erectors tries to rely on the first-filed version even though it previously denied that it was an authentic copy.

There needs to be a neutral rule that applies to both parties equally.  If a party can't get out of a statement in a pleading about the original-filed version of the agreement, then that rule applies to Area Erectors, and Area Erectors can't argue that the original version is the right version.[8]  The better approach is simple:  the parties did not make judicial admissions about the first-filed version of the agreement.

So Illini Hi-Reach is not bound by the copy of the agreement that it originally filed.  Still, there is a lingering question of which version is the right version.  Area Erectors argues that there was testimony that the first-filed version was the right version after all.  The initial briefs were a bit murky, *see* Area Erectors's S.J. Brf., at 14–21 (Dckt. No. 149); Illini Hi-Reach's S.J. Brf., at

---

[8]  Area Erectors could have argued that attaching a document to the pleading is an act of authentication, in and of itself, and thus is a statement of a party opponent.  *See* Fed. R. Evid. 801(d)(2).  But Area Erectors made no such argument, and thus is is waived.  Instead, Area Erectors put all of its eggs in the judicial admission basket.

12–14 (Dckt. No. 220); Area Erectors's Resp., at 2, 20–24 (Dckt. No. 232), so the Court ordered supplemental briefs in the hope of clearing things up.[9]  *See* Order dated 6/5/20 (Dckt. No. 359).

Illini Hi-Reach has come forward with evidence that the second version is the right version.  For example, Jamie Gray, the Vice President of Illini Hi-Reach, testified that the first-filed version of the agreement included the wrong second page.  *See* Gray Dep., at 15:8 – 16:16, 26:24 – 27:2, 28:3-8, 84:1-9 (Dckt. No. 363-4).  Counsel later marked as an exhibit the second-filed version of the agreement, and Gray testified that it contained the right second page.  *Id.* at 48:10 – 49:14.  The President of Illini Hi-Reach, Larry Workman, also testified that the original-filed version was incorrect.  *See* Workman Dep., at 108:22 – 109:20 (Dckt. No. 363-5).[10]

So there is admissible evidence on Illini Hi-Reach's side of the ledger.  There is testimony that the second-filed version was the right version.  Two witnesses testified that the first-filed version of the agreement was wrong, and that the second-filed version of the agreement was right.

Area Erectors responded that it lacks personal knowledge about which page was the right page because it never received a copy of the contract at all.  (More on that later, below).  *See* Area Erectors's Supp. Resp. Brf., at 1 (Dckt. No. 361).  "Area has consistently stated that prior to this lawsuit it never received any Rental Out Agreement claimed by Illini Hi-Reach, Inc. ('Illini').  Since it never received the original document it can only deal with documents

---

[9]  The first sentence of Area Erectors's brief declared that "it is irrelevant which document is controlling since Area is entitled to summary judgment under either version."  *See* Dckt. No. 361, at 1.  But it is important to figure out the terms of the agreement.  And respectfully, the question is relevant because the Court asked.  The Court asked pointed questions and directed the parties "to be concise, clear, and on-point, and not address collateral matters."  *See* Order dated 6/5/20 (Dckt. No. 359).  Area Erectors did not comply, and largely went off topic.

[10]  Illini Hi-Reach also relies on testimony from the field superintendent for Area Erectors, John Thomas.  *See* Thomas Dep., at 37:3-24 (Dckt. No. 363-9).  The witness identified the document as the Rental Out Agreement.  But the testimony did not delve into which second page was the right second page.

produced and authenticated by Illini . . . ." *Id.*; *see also id.* at 2 ("Area, without receiving the original document, cannot answer what the operative Rental Out Terms [sic] Illini intended, if any.").

But Area Erectors insisted that four employees of Illini Hi-Reach testified at deposition that the original version was the right version. *Id.* at 3–5. Area Erectors pointed to testimony from four witnesses: Louis Roon, Jacalyn Novak, Tina Hermanek, and Diane Mayes.[11] *Id.*; *see also* Area Erectors's S.J. Brf., at 16–18 (Dckt. No. 149). So, based on that representation, the Court dug into the testimony. And the testimony does not live up to its billing.

For starters, counsel did not present the issue cleanly to any of the four witnesses. Counsel did not show both versions of the agreement to any of the four witnesses, and ask them to clarify which version was the right version. The only two witnesses who addressed that issue squarely – Jamie Gray and Larry Workman from Illini Hi-Reach – testified that the second version was right, and the first version was wrong. So, the testimony that counsel elicited from the other four witnesses is of limited value because it did not confront the issue at hand.

Instead of relying on on-point testimony, Area Erectors relies on testimony about the agreement generally. None of the four witnesses squarely addressed the issue, and none of them testified that the first-filed version was the right version.

Louis Roon did not testify about which second page was the right second page. *See* Roon Dep. (Dckt. No. 151-7). Area Erectors claims that "Roon at his deposition identified the original Exhibit 2 of the original Third Party Complaint as the document he signed." *See* Area Erectors's S.J. Brf., at 16 (Dckt. No. 149) (citing Roon Dep., at 13–14 (Dckt. No. 151-7)). But his

---

[11] The Court ordered supplemental briefing because the original briefs were, respectfully, less than entirely lucid. In its supplemental brief, Area Erectors largely disregarded this Court's directive. Area Erectors declared that it "will not repeat its argument and a recounting of their testimony," and referred this Court to its prior brief. *See* Area Erectors's Supp. Resp. Brf., at 3 (Dckt. No. 361).

testimony on pages 13-14 of the transcript (as cited by Area Erectors) said nothing about the

second page of the agreement. And when asked about the second page, Roon testified that he

"never looks at the back" of the agreements, and he hadn't read it in 20 years:

> Q: Okay. And if you look at the second page of that, do you recognize that document?
>
> A: I never look at the back, but yeah, it looks like that's probably what is on the back.
>
> Q: Have you ever read the terms and conditions on the back?
>
> A: Yeah, a long time ago.
>
> Q: How long ago?
>
> A: **Twenty years ago**.

*See* Roon Dep., at 19:12-20 (Dckt. No. 151-7) (emphasis added). And 20 years ago, he "wasn't

working for Illini. [He] was working for somebody else." *Id.* at 19:23-24. So, whatever he read

20 years ago, it wasn't an agreement involving Illini Hi-Reach, and it certainly wasn't an

agreement between Illini Hi-Reach and Area Erectors.

In fact, Roon testified that he "actually never read Illini's" contract. *Id.* at 20:4. One

wonders how Area Erectors could rely on testimony from a witness – and make a representation

about it to this Court – when the witness never even read the page in question.

Area Erectors then claims that Roon "identified the second page (back of the document),

of the original Exhibit B to the initial Complaint," and testified that he had "no reason to believe

that it was not a complete copy of the second page." Area Erectors's S.J. Brf., at 16 (Dckt. No.

149). Area Erectors points to this testimony:

> Q: – the back of this? In regard to this document it calls for – the request calls for a complete copy of the second page. Do you have any reason to believe this is not an accurate copy of the second page of the back side of the rental-out agreement of Illini?
>
> A: No.

*See* Roon Dep., at 20:16-22 (Dckt. No. 151-7).

That testimony adds nothing. Saying "I have no reason to doubt X" does not mean "X is true." And saying "I have no reason to think not-X" does not mean "X is true," either. Imagine asking people on the street if they have any reason to doubt that the Dirksen federal courthouse is located at 319 S. Dearborn Street. And imagine if everyone said that they have no reason to doubt it. That's different than a statement from a person with personal knowledge saying that the federal courthouse is, in fact, located at 319 S. Dearborn Street. (As an aside, the courthouse is located at 219 S. Dearborn Street.) A statement that a person has no reason to doubt X is not the same thing as a statement that the person knows X.

The next witness, Jacalyn Novak, testified that she didn't know which page was the right second page. She had no idea:

> Q:    In regards to the language on Exhibit 2 of 1A that we referred
>       to earlier, do you dispute that that's actually the language
>       that is sent out by Illini to its customers?
>
> [Objection omitted]
>
> A:    Don't know.
>
> Q:    So you don't know one way or the other whether that is the
>       correct language or the wrong language that's sent out?
>
> [Objection omitted]
>
> A:    No.

*See* Novak Dep., at 42:5-17 (Dckt. No. 152-1).

The next witness, Tina Hermanek, came a little closer. She testified that she was "aware of what is on front and back" of the Rental Out Agreements. *See* Hermanek Dep., at 21:20-21 (Dckt. No. 152-2). But counsel stopped short of asking her which page was the right page. Area Erectors claims that she "emphatically identified" the first-filed version "as the one dealing with customer identification and obligations and agreed that it was a document she has reviewed

34

through the years." Area Erectors's S.J. Brf., at 17 (Dckt. No. 149) (citing Hermanek Dep., at 32 (Dckt. No. 152-2)).

But the testimony underwhelms. In the transcript page in question, Hermanek testified that the Rental Out Agreement would apply to the accident, including the general provisions on the second page. *See* Hermanek Dep., at 31:14 – 32:8 (Dckt. No. 152-2). Counsel then showed her the first-filed version, and asked her the following:

> Q: And, again, I'll show you Exhibit 2 and I'll ask you, is that the document you've reviewed through the years?
>
> A: Yes.

*Id.* at 32:16-19.[12] That testimony adds nothing. Saying that Exhibit X is a document that she has "reviewed through the years" is not the same thing as saying that Exhibit X is the contract between Illini Hi-Reach and Area Erectors.

Area Erectors also relies on page 47 of Hermanek's deposition transcript, but once again, the testimony comes up short. *See* Area Erectors's Supp. Resp. Brf., at 4–5 (Dckt. No. 361). Counsel asked the following:

> Q: Okay. Here. I can show it to you. That's the same document, correct?
>
> A: Yes.
>
> Q: And if you look at the back of it, it has the same back, correct?
>
> A: Yes.
>
> Q: The same verbiage. Take a moment to look at that, the general provisions. Is that the same general provisions you're familiar with through the years with Illini?
>
> A: Yes.

---

[12] Area Erectors relied on this passage in its original brief (Dckt. No. 149, at 17), but not in its supplemental brief (Dckt. No. 361). The latter brief is more important, because this Court directed the parties to identify any testimony that supports their position about which page was the right page.

*See* Hermanek Dep., at 47:8-18 (Dckt. No. 152-2). That testimony sheds no light. Even if "it" and "that" referred to the first-filed version of the agreement, the witness did not confirm that the first-filed version was correct. A statement that a document has the "same general provisions" as other agreements "through the years" is not a statement that the document is the contract between Illini Hi-Reach and Area Erectors.

The final witness that Area Erectors relies upon, Diane Mayes, did not testify in favor of the first-filed version, either. Area Erectors represented that she "identifies the original document she created regarding the equipment involved in the accident as the correct document she created for the equipment involved in the accident." *See* Area Erectors's Supp. Resp. Brf., at 4 (Dckt. No. 361). Not so. Counsel asked another any-reason-to-doubt question:

> Q:     In regards to this rental-out agreement, the back page of it
> we're talking about here, do you have any dispute or
> disagreement that that, in fact, was the document that was
> sent to Area Erectors for the rental of this equipment?
>
> [Objection omitted]
>
> A:     No.

*See* Mayes Dep., at 28:2-9 (Dckt. No. 152-3). Again, a statement that "I have no reason to doubt X" does not mean "I know that X is true."

Area Erectors had multiple opportunities to present evidence that the first-filed version of the agreement was the correct version. *See Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007) ("[S]ummary judgment is 'not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit.'") (citation omitted). This Court expressly invited supplemental submissions from the parties on this issue. *See* Order dated 6/5/20 (Dckt. No. 359). And when the time came, Area Erectors came up empty. After going down the rabbit hole, and finding nothing, the Court confirmed that there is no testimony supporting the notion that the first-filed

version was right.  There is admissible evidence on only one side of the scale about which page

was the true second page.

Accordingly, this Court holds that there is no genuine issue of material fact on whether

the later-filed version is the true version.  The undisputed facts reveal that the first-filed version

was a mistake, and that the second-filed version was the putative agreement between Illini Hi-

Reach and Area Erectors.  This Court denies the motion for summary judgment filed by Area

Erectors to the extent that it made any argument based on the first-filed version.

### B.      The Statute of Frauds

Next, Area Erectors argues that the contract is unenforceable under the statute of frauds.

The Rental Out Agreement does contain a signature, but there is some dispute about who signed

it.  *See* Dckt. No. 137-2; *see also* Dckt. No. 72-2.  Area Erectors argues that the Rental Out

Agreement is a nullity because it is a mystery who signed it, and whoever signed it had no

authority to bind the company.

"The purpose of the statute of frauds is to prevent a contracting party from creating a

triable issue concerning the terms of the contract – or for that matter concerning whether a

contract even exists – on the basis of his say-so alone."  *Cloud Corp. v. Hasbro, Inc.*, 314 F.3d

289, 296 (7th Cir. 2002).  The statute of frauds essentially requires some external confirmation of

the existence of a contract.  *See Cohabaco Cigar Co. v. U.S. Tobacco Co.*, 1999 WL 988805, at

*4 (N.D. Ill. 1999) ("The main purpose of the statute of frauds is to prevent parties from

becoming bound to agreements they have not made.").  The statute "exists to protect not just the

parties to a contract, but also – perhaps more importantly – to protect the fact finder from

charlatans, perjurers and the problems of proof accompanying oral contracts."  *McInerney v.

Charter Golf, Inc.*, 176 Ill. 2d 482, 489, 223 Ill. Dec. 911, 680 N.E.2d 1347 (1997).

But the goal is not to create an escape hatch based on technicalities for contracts that clearly exist, either.  "The purpose of the Statute of Frauds is to prevent fraud, not facilitate it." *Benefit Vision Inc. v. Conseco Life Ins. Co.*, 2014 WL 5614711, at *7 (N.D. Ill. 2014) (quoting *Crawley v. Hathaway*, 309 Ill. App. 3d 486, 491, 242 Ill. Dec. 677, 721 N.E.2d 1208 (1999)).

Under Illinois law (and the UCC), a "lease contract is not enforceable by way of action or defense unless:  (a) the total payments to be made under the lease contract, excluding payments for options to renew or buy, are less than $1,000; or (b) there is a writing, signed by the party against whom enforcement is sought or by that party's authorized agent, sufficient to indicate that a lease contract has been made between the parties and to describe the goods leased and the lease term."  *See* 810 ILCS 5/2A-201(1).

The first prong does not apply here.  Area Erectors rented the manlift at a rate of $200 per day, or $525 per week, or $1,450 for four weeks.  *See* Rental Out Agreement (Dckt. No. 137-2); *see also* Dckt. No. 72-2.  The agreement is dated September 26, 2014, and Area Erectors was continuing to rent the manlift when the accident happened in January 2015.  No party argues that the contract contemplated payments of less than $1,000, and the evidence is to the contrary.  *See* Illini Hi-Reach Invoice (Dckt. No. 234-1) (showing that Area Erectors owed $1,450 for the first four weeks of the rental).

Area Erectors argues that the Rental Out Agreement does not satisfy the second prong, either.  The statute requires a signature "by the party against whom enforcement is sought or by that party's authorized agent."  *See* 810 ILCS 5/2A-201(1)(b).  Area Erectors argues that the identity of the signatory is shrouded in mystery.  The parties debate whether Kevin Podobinski, one of the welders for Area Erectors, signed the form at the time of delivery.  *See* Illini Hi-Reach Rule 56.1 Statement of Additional Material Facts, at ¶ 24 (Dckt. No. 221); Area Erectors's Resp.

to Illini Hi-Reach Rule 56.1 Statement of Additional Material Facts, at ¶ 24 (Dckt. No. 234); Area Erectors's Rule 56.1(a)(3) Additional Facts, at ¶¶ 38–39 (Dckt. No. 237). Podobinski testified that he didn't sign it. *See* Podobinski Dep. 33:14-20 (Dckt. No. 232-6). Area Erectors argues that it does not matter if a welder signed it, because only its president (Craig Shelton) or vice president (Jeff Shelton) had the authority to bind the company. *See* Area Erectors's Resp., at 11 (Dckt. No. 232).

That debate is beside the point. The statute of frauds contains an exception for goods that are delivered and accepted. "A lease contract that does not satisfy the requirements of subsection (1), but which is valid in other respects, is enforceable: . . . (c) with respect to goods that have been received and accepted by the lessee." 810 ILCS 5/2A-201(4)(c). That is, accepting the delivery of goods – in and of itself – can verify the existence of a contract. "The UCC statute of frauds does not require that the writing contain the terms of the contract. In fact it requires no more than written corroboration of the alleged oral contract. Even if there is no such signed document, the contract may still be valid 'with respect to goods . . . which have been received and accepted.'" *Monetti, S.P.A. v. Anchor Hocking Corp.*, 931 F.2d 1178, 1181 (7th Cir. 1991) (quoting UCC § 2-201(3)(c)); *Andersen v. Koss*, 173 Ill. App. 3d 872, 877, 123 Ill. Dec. 460, 527 N.E.2d 1098 (1988) ("[W]here the conduct which is relied upon for part performance is consistent with the contract, such conduct is sufficient to take the contract out of the statute of frauds even though such conduct is not inconsistent with some other dealings arguably had between the parties.") (citation omitted).[13]

---

[13] The Seventh Circuit discussed the statute of frauds as applied to the sale of goods, but the rationale equally applies to the leasing of goods. Either way, one party provides goods to another, and the act of receipt and acceptance validates the existence of a contract. The lease-based provision "is modeled on Section 2-201, with changes to reflect the differences between a lease contract and a contract for the sale of goods." *See* 810 ILCS 5/2A-201 cmt.

Accepting the goods corroborates the existence of a contract *for* the goods. "Receipt and acceptance either of goods or of the price constitutes an unambiguous overt admission by both parties that a contract actually exists." 810 ILCS 5/2-201 cmt. 2.[14] "Subsections 2-201(3)(a), (b), and (c) all contemplate enforcement of certain oral contracts absent a writing. But in each of these exceptions, a valid oral contract must be proved, plus something more. This 'something more' varies in each of the exceptions, but each has this in common: it is a kind of special indicator that a contract, albeit oral, was in fact made." 1 James J. White & Robert S. Summers, Uniform Commercial Code § 3:7 (6th ed. 2019). Common sense explains why accepting goods counts. Parties do not "ordinarily confer gratuitous benefits on others, except perhaps at Christmas or during other holidays." *Id.*

That rule applies here. Area Erectors does not dispute that it received and accepted the manlift. In fact, in its own Rule 56.1 statement, Area Erectors admits that it received the manlift from Illini Hi-Reach and used it until Wilda's accident. *See* Area Erectors's Amended Rule 56.1(a)(3) Statement of Undisputed Material Facts, at ¶¶ 2–4 (Dckt. No. 154). Area Erectors doesn't contend that it rejected the manlift. *Cf.* UCC §§ 2-602, 606. Area Erectors admits that it paid to rent the equipment, too. *See* Area Erectors's Resp. to Illini Hi-Reach's Rule 56.1 Statement of Additional Material Facts, at ¶ 40 (Dckt. No. 234). If there was no contract, one wonders what Area Erectors was doing with Illini Hi-Reach's manlift.

Area Erectors accepted delivery of the equipment. So it cannot invoke the statute of frauds and argue that there was no agreement to rent the equipment.

---

[14] Again, this section covers the sale of goods, not the lease of goods. But the principle is the same.

### C.    Receipt of the Terms

Area Erectors then argues that there was no "meeting of the minds" on the terms of the Rental Out Agreement. *See* Area Erectors's Resp., at 13 (Dckt. No. 232). Once again, the company emphasizes the lack of a signature by someone with authority. *See id.* at 14–15. But more importantly, Area Erectors also argues that it never received the second page of the Rental Out Agreement at all. So it could not have assented to terms that it never received.

"Under Illinois state law, an enforceable contract requires an offer, acceptance, consideration, and mutual assent." *Nat'l Prod. Workers Union Ins. Trust v. Cigna Corp.*, 665 F.3d 897, 901 (7th Cir. 2011); *see also Mannion v. Stallings & Co.*, 204 Ill. App. 3d 179, 186, 149 Ill. Dec. 438, 561 N.E.2d 1134 (1990) ("To meet his burden in a breach of contract action, the plaintiff must establish an offer and acceptance, consideration, definite and certain terms of the contract, plaintiff's performance of all required contractual conditions, the defendant's breach of the terms of the contract, and damages resulting from the breach.").

When deciding whether there is mutual assent to a contract, "the parties' subjective intentions are irrelevant." *Nat'l Prod. Workers Union*, 665 F.3d at 901. "Secret hopes and wishes count for nothing because the status of a document as a contract depends on what the parties express to each other and to the world, not on what they keep to themselves." *Laserage Tech. Cop. v. Laserage Labs., Inc.*, 972 F.2d 799, 802 (7th Cir. 1992) (cleaned up). Instead, mutual assent depends on "objective evidence" at the time of contract formation. *Id.*

A signature often reflects mutual assent. But a signature is not the be-all and end-all for a contract, either. "Only where signatures are an expressly-required condition-precedent of an agreement will their absence render the contract voidable." *Testa v. Emeritus Corp.*, 2015 WL 5183900, at *4 (N.D. Ill. 2015). "The object of a signature is to show mutuality or assent, but

41

these facts may be shown in other ways, [such] as by acts or conduct of the parties." *Hedlund and Hanley, LLC v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 376 Ill. App. 3d 200, 206, 315 Ill. Dec. 1, 876 N.E.2d 1 (2007) (quoting *Lynge v. Kunstmann*, 94 Ill. App. 3d 689, 694, 50 Ill. Dec. 146, 418 N.E.2d 1140 (1981)).

Illini Hi-Reach offers evidence that Area Erectors assented to a contract. Area Erectors received and paid for the use of the manlift. *See* Illini Hi-Reach Reply, at 3–4 (Dckt. No. 250). The payment may be evidence that a *contract* existed, but it says nothing about the terms of the contract. The fact that Area Erectors accepted the manlift doesn't mean that it accepted all of the terms on the second page of the Rental Out Agreement.

Illini Hi-Reach also points to the long course of dealing between the parties. Area Erectors has rented hundreds of machines from Illini Hi-Reach over the years. *See* Illini Hi-Reach's S.J. Brf., at 8 (Dckt. No. 220); Area Erectors's Resp. to Illini Hi-Reach's Rule 56.1 Statement of Additional Material Facts, at ¶ 33 (Dckt. No. 234). Illini Hi-Reach implies that it has used similar rental out agreements for past equipment rentals with Area Erectors. *See* Area Erectors's Resp. to Illini Hi-Reach's Rule 56.1 Statement of Additional Material Facts, at ¶¶ 41–44 (Dckt. No. 234). However, "[f]or the course of conduct to act as consent to a contract, it must be clear that the conduct relates to the specific contract in question." *Landmark Properties, Inc. v. Architects International-Chicago*, 172 Ill. App. 3d 379, 384, 122 Ill. Dec. 344, 526 N.E.2d 603 (1998). Consenting to similar agreements does not necessarily mean that Area Erectors consented to this particular agreement. So the course of dealing is evidence of assent – perhaps strong evidence to a jury – but it is not dispositive evidence.

Illini Hi-Reach faults Area Erectors for "continually engag[ing] in a course of conduct indicating acceptance of this Agreement without any dispute whatsoever, *until it was asked to*

42

*abide by the terms of the Agreement*." *See* Illini Hi-Reach's Reply, at 3 (Dckt. No. 250) (emphasis added). But Area Erectors responds that it never saw the terms of the agreement to begin with. *See* Area Erectors's Resp., at 15 (Dckt. No. 232). So it couldn't "dispute" what it didn't receive (according to Area Erectors, that is).

A party needs notice of the terms of a contract to be bound by them. "[I]f a party accepts benefits under a contract, this conduct does not constitute acceptance of specific, written terms unless there is evidence that the party took the benefits with knowledge of those terms." *Mohammed v. Uber Techs., Inc.*, 237 F. Supp. 3d 719, 730 (N.D. Ill. 2017); *see also Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1036 (7th Cir. 2016) (declining to find that plaintiff's acceptance of benefits under a contract meant that he accepted the agreement's terms when he lacked notice of the terms); *Trieber & Straub, Inc. v. U.P.S., Inc.*, 474 F.3d 379, 385 (7th Cir. 2007) (holding that a party cannot renege on a contract for its failure to read it, but cautioning that "[i]t would be different if, for example, Trieber arranged for the shipment in a face-to-face transaction and was never given a copy of . . . the Terms and Conditions of Service"); *Halmos v. Steiner*, 1998 WL 560286, at *4 (N.D. Ill. 1998) ("defendants have not presented any evidence to support their assertion that the plaintiff must have received the contract."); *Lundin v. Egyptian Const. Co., Inc.*, 29 Ill. App. 3d 1060, 1064, 331 N.E.2d 208 (1975) ("Plaintiffs have offered no evidence that defendant's conduct was related specifically to the written Confirming Order rather than the already existing oral contract.").

The question is whether Area Erectors ever received a complete copy of the Rental Out Agreement in the first place. Illini Hi-Reach offers evidence about its practice for delivering agreements in general. When Illini Hi-Reach's driver (Louis Roon) dropped off the JLG manlift, he was "supposed to leave" a copy and get a signature from someone with Area Erectors. *See*

43

Illini Hi-Reach's Rule 56.1 Statement of Additional Material Facts, at ¶¶ 8, 10 (Dckt. No. 221). If the customer does not sign for the equipment and is not at the job site, Illini Hi-Reach sends a copy of the terms and conditions through an invoice. *Id.* at ¶¶ 14–15. Illini Hi-Reach claims that it followed that practice here, as demonstrated by the signed Rental Out Agreement. *See* Illini Hi-Reach's S.J. Brf., at 20–22 (Dckt. No. 220); Rental Out Agreement (Dckt. No. 137-2). The signature is sufficient evidence for a reasonable jury to find that Area Erectors consented to the contract.

But Area Erectors presents evidence that Illini Hi-Reach didn't follow that procedure here. There is at least some evidence that Area Erectors never received the second page. For starters, it is a mystery who signed the agreement. Illini Hi-Reach thinks that Kevin Podobinski signed it, but he testified that it was not his signature. *See* Podobinski Dep. 33:14-20 (Dckt. No. 232-6). Illini Hi-Reach cannot rely on the signature as dispositive evidence of assent when it is unknown who signed it, and when the alleged signatory testified that it wasn't his signature. There is a genuine issue of material fact about who signed the agreement.

Area Erectors did not squarely testify that it never received a copy. But the accounts payable manager at Area Erectors testified that she didn't see the terms and conditions until this litigation began. *See* Area Erectors's Rule 56.1(a)(3) Additional Facts, at ¶¶ 53, 58 (Dckt. No. 237). The testimony from the accounts payable manager is consistent with the notion that Area Erectors never received a copy. *Id.* at ¶¶ 54, 57–58.

Area Erectors also points out that the copy of the invoice in its files *doesn't* have the terms and conditions. *See* Area Erectors's Resp. to Illini Hi-Reach's Rule 56.1 Statement of Additional Material Facts, at ¶ 14 (Dckt. No. 234). And Illini Hi-Reach did not follow its protocol in each and every case. Illini Hi-Reach's Vice President testified that, as a matter of

44

practice, Illini Hi-Reach actually doesn't send the terms and conditions to a customer when it fails to obtain a signature at the jobsite. *See* Area Erectors's Rule 56.1(a)(3) Additional Facts, at ¶¶ 32–33, 40 (Dckt. No. 237).

So there is a genuine issue of material fact about whether Area Erectors ever received the second page of the Rental Out Agreement with the terms and conditions. Area Erectors is not bound by terms of a contract that it did not receive, unless there is some other basis to conclude that Area Erectors assented to them. A jury needs to decide whether Area Erectors ever assented to the second page of the Rental Out Agreement. *See Mecum v. Weilert Custom Homes, LLC*, 239 F. Supp. 3d 1093, 1096 (N.D. Ill. 2017) (denying motion for summary judgment due to a dispute of material fact about whether plaintiff received the agreement).

Maybe Illini Hi-Reach could have argued constructive notice. That is, the first page of the Rental Out Agreement expressly incorporates the terms and conditions on the second page: "The above described Equipment has been received . . . and is accepted by CUSTOMER, subject to the terms and conditions on the reverse side hereof, which are hereby made a part hereof by reference as if fully set forth herein." *See* Rental Out Agreement, at 1 (Dckt. No. 137-2). The first page quickly repeats the point: "PLEASE READ THIS CONTRACT BEFORE SIGNING **NOTE: RENTAL AGREEMENT TERMS & CONDITIONS ON REVERSE SIDE. (CUSTOMER TO RETAIN COPY)." *Id.* But Illini Hi-Reach made no such argument. And the record is undeveloped, too. The parties don't cleanly present the facts about whether Area Erectors ever received the *first* page, let alone the second one.

### D. The Illinois Construction Contract Indemnification for Negligence Act

Area Erectors makes another argument in favor of summary judgment. Area Erectors contends that the Illinois Construction Contract Indemnification for Negligence Act forecloses any claim for indemnification. Not so. This case doesn't involve a construction contract.

Illinois law does not prohibit indemnification agreements writ large. "Illinois courts will generally enforce contracts of indemnity against one's own negligence." *Winston Network, Inc. v. Indiana Harbor Belt R.R. Co.*, 944 F.2d 1351, 1359 (7th Cir. 1991). But the Indemnification Act carves out an exception. Based on its plain text, the statute applies only to certain types of construction agreements:

> With respect to contracts or agreements, either public or private, for the construction, alteration, repair or maintenance of a building, structure, highway bridge, viaducts or other work dealing with construction, or for any moving, demolition or excavation connected therewith, every covenant, promise or agreement to indemnify or hold harmless another person from that person's own negligence is void as against public policy and wholly unenforceable.

*See* 740 ILCS 35/1.

The statute prohibits construction agreements that require a person to indemnify a second person for the second person's own negligence. The purpose of the Indemnification Act is to "foster workplace safety by preventing a party from insulating itself from liability through use of a contractual indemnification provision which may deter the exercise of ordinary care." *Virginia Sur. Co. v. N. Ins. Co. of New York*, 224 Ill. 2d 550, 560, 310 Ill. Dec. 338, 866 N.E.2d 149 (2007); *Davis v. Commonwealth Edison Co.*, 61 Ill. 2d 494, 499, 336 N.E.2d 881 (1975) ("The statute would thwart attempts to avoid the consequences of liability and thereby insure a continuing motivation for persons responsible for construction activities to take accident prevention measures and provide safe working conditions."); *North River Ins. Co. v. Byer,* 275 Ill. App. 3d 175, 180, 211 Ill. Dec. 604, 655 N.E.2d 987 (1995) ("[T]he Act is intended and

serves to protect construction workers in the construction industry and the public as well from the dangers associated with construction work."). The idea is that people will act with greater care – and thus create safer working environments – if they have to internalize the costs of their own negligence.

"Stripped to its bare essentials, the Illinois [anti-indemnity] statute prevents indemnity against a party's own negligence in construction contracts." *Winston Network*, 944 F.2d at 1358 (citation omitted). The "Indemnification Act provides that indemnification provisions in construction contracts which purport to relieve a party from liability for its own negligence are void as against public policy." *Field v. Norfolk & W. Ry. Co.*, 1998 WL 372090, at *2 (N.D. Ill. 1998).

Area Erectors thinks that the statute applies because Wilda suffered fatal injuries "while performing construction work at a construction site." *See* Area Erectors's S.J. Brf., at 8 (Dckt. No. 149). But the statute does not apply to anything and everything that relates to construction. The statute applies to contracts "for" the construction, alteration, repair, or maintenance of a building. *See* 740 ILCS 35/1. A contract "for" construction does not mean a contract "about," "related to," or "in connection with" construction. It means a contract to build something.

The Rental Out Agreement does not fall within the boundaries of the statutory text. Area Erectors did not enter into an agreement with Illini Hi-Reach "for" the construction, alteration, repair, or maintenance of anything. Area Erectors didn't agree to construct anything for Illini Hi-Reach, or vice versa. Instead, Area Erectors agreed to rent equipment from Illini Hi-Reach. *See* Rental Out Agreement, at 2 (Dckt. No. 137-2) ("Illini Hi-Reach, Inc. . . . hereby rents to the customer . . . named on the front of this Equipment Rental Agreement . . . and Customer hereby

rents from [Illini Hi-Reach], the personal property set forth on the front side of this Agreement.").

A contract "for" construction does not mean a contract "in connection with" construction. Reading those phrases to mean the same thing would overstretch the text, and would undercut the rest of the paragraph, too. The statute also applies to contracts "for any moving, demolition or excavation connected therewith." *See* 740 ILCS 35/1. So it does not apply to contracts for *anything else* "connected therewith." *See* Antonin Scalia & Bryan Garner, Reading Law: The Interpretation of Legal Texts 107–111 (2012) (explaining the negative-implication canon). Supplying equipment is not "moving, demolition, or excavation."

The fact that Area Erectors planned to use the equipment for construction does not change the essential character of the contract. It was a rental agreement, not a construction contract. It does not matter that the accident happened on a construction site, because the "focus of the statute . . . is 'contracts or agreements,' not accidents." *Winston Network*, 944 F.2d at 1359. "The statute, after all, applies to contracts '*for* the construction, alteration, repair or maintenance' of a structure, not to contracts '*having some connection with* the construction, alteration, repair or maintenance' of a structure." *Id.* (emphasis in original); *see also Keilman v. Sam's West Inc.*, 2018 WL 4563074, at *2–3 (N.D. Ill. 2018) (holding that the statute did not apply because the contract involved the "distribution, delivery, loading and unloading of goods," not "construction, repair, or maintenance work"); *Avalos v. Pulte Home Corp.*, 2006 WL 3813735, at *4 (N.D. Ill. 2006) (finding that the delivery of construction materials did not fall within the Act).

The Rental Out Agreement did not involve "other work dealing with construction," either. *See* 740 ILCS 35/1. The preceding phrase reveals what the statute means by "*other*

work." *Id.* (emphasis added). "Work" means to "construct[]," "alter[]," "repair," or "maint[ain]" a building. *Id.* A rental of equipment is not "work."

The statutory language is bolted to a word with a plain meaning: "work." The phrase "other work dealing with construction" does not mean "*anything else* dealing with construction." Providing goods, without more, is not enough. Area Erectors would unfasten the statutory language from its foundation, transforming every supplier into a construction worker.

In *Avalos*, a court in this District held that the statute did not apply to the delivery of building materials to a construction site. "While the types of materials Wheaton contracted to deliver were intended for and used in the construction of buildings, the Court would have to cast the 'other work' net too broadly if the Act were to cover contracts like the Wheaton-Pulte contract." *Avalos*, 2006 WL 3813735, at *4. The contract was "less akin to a construction contract than to a delivery contract." *Id.*

The same result applies here. Illini Hi-Reach agreed to rent equipment to Area Erectors. It did not agree to perform work dealing with construction. *Area Erectors* may have agreed to perform construction work for someone else, but that's not a reason to recast the character of its agreement with Illini Hi-Reach.

Area Erectors relies heavily on *Pekin Ins. v. Designed Equip. Acquisition Corp.*, 2016 IL App (1st) 151689-U (2016).[15] *Pekin* involved the lease of scaffolding materials for use at a

---

[15] The Court is not bound to follow the decisions of an Illinois intermediate appellate court. *See Cmty. Bank of Trenton v. Schnuck Mkts., Inc.*, 887 F.3d 803, 811 (7th Cir. 2018) ("[O]ur role in deciding these questions of state law is to predict how the highest courts of the respective states would answer them. We are to take into account trends in a state's intermediate appellate decisions, but the focus is always a prediction about the state's highest court.") (internal citations omitted); *Taco Bell Corp. v. Cont'l Cas. Co.*, 388 F.3d 1069, 1077 (7th Cir. 2004) ("The duty of a federal court in a diversity suit is to predict what the state's highest court would do if presented with the identical issue."); *Baer v. First Options of Chicago, Inc.*, 72 F.3d 1294, 1301 (7th Cir. 1995) ("We are obliged to consider the holdings of state appellate courts but are not bound to do so if we have good reasons for diverging from those decisions."). It is persuasive authority only. *Adams v. Catrambone*, 359 F.3d 858, 862 (7th Cir. 2004); *see also*

construction site. *Id.* at ¶ 3. The intermediate state appellate court held that the Indemnification Act applied, and thus voided an indemnification provision. *Id.* at ¶ 34.

But Area Erectors overlooks an important part of the holding. The contract required a party to "deliver and assemble" a scaffolding on a building. *Id.* The state court repeatedly pointed to the fact that the contract required the assembly of the scaffolding. *Id.* ("The parties agree that the lease required Designed to deliver and assemble the scaffolding. . . . The lease required Designed to deliver and assemble scaffolding, which is certainly a type of work that deals with construction, and if not construction specifically, then 'alteration, repair or maintenance of a building.'"). The scaffold didn't build itself. Someone had to build it. And the assembly of the scaffolding was work.

The assembly work made all the difference. The statute covers the "alteration, repair or maintenance of a building." *See also* 740 ILCS 35/1. Assembling a scaffold on a building is part of maintaining a building. Renting a manlift is not. The assembly work also was "work dealing with construction." *Id.* But a rental is not "work." Illini Hi-Reach performed no such work on a building under construction. It simply dropped off a piece of equipment.

The Court denies the motion for summary judgment filed by Area Erectors to the extent that it relied upon the Illinois Construction Contract Indemnification for Negligence Act.

---

*Cilliers v. Cobalt Holdings, Inc.*, 2019 WL 1514977, at *3 (N.D. Ill. 2019) (If the Seventh Circuit has already "predict[ed] how the Illinois Supreme Court would rule on [an] issue," "the Court is bound by the Seventh Circuit's decision, even if subsequent state appellate court decisions diverge from the Seventh Circuit's interpretation."). The Court pays special heed to the Seventh Circuit's decision in *Winston Network*, which focused on the statutory text. *See Winston Network*, 944 F.2d at 1359 ("The statute, after all, applies to contracts '*for* the construction, alteration, repair or maintenance' of a structure, not to contracts '*having some connection with* the construction, alteration, repair or maintenance' of a structure.") (emphasis in original).

### E.     Contribution

Area Erectors makes a smattering of other arguments in its brief.[16]  Along the way, Area Erectors drops a few paragraphs about contribution.  It recounts how it settled with Wilda's estate in the state court case.  And it claims that the Illinois Joint Tortfeasor Contribution Act, 740 ILCS 100/2, prevents a tortfeasor from recovering contribution from another tortfeasor who settled with the plaintiff in good faith.  *See* Area Erectors's S.J. Brf., at 3–5 (Dckt. No. 149).

The argument by Area Erectors is fairly cursory.  And Illini Hi-Reach responds with even less.  *See* Illini Hi-Reach's S.J. Brf. (Dckt. No. 220).  In fact, Illini Hi-Reach does not respond to the contribution argument at all.  Maybe the omission was intentional.  Based on the Court's review of the Third-Party Complaint, it appears that Illini Hi-Reach is not advancing a contribution claim against Area Erectors.  *See* Illini Hi-Reach's Third-Party Cplt. (Dckt. No. 137).

So Area Erectors makes a thin argument, with no response from Illini Hi-Reach, about a claim that does not appear in the pleading.  This Court sees no live issue, and won't address an argument about an illusory claim.  If there is a live issue, the parties can raise it down the road.

### Conclusion

The Court grants JLG's motion for summary judgment (Dckt. No. 217) on Count I (the indemnification claim) of its Third-Party Complaint against Illini Hi-Reach.  The Court denies JLG's motion for summary judgment on Count II (the contribution claim) of its Third-Party Complaint.  The Court also dismisses Count II of JLG's Third-Party Complaint against Illini Hi-

---

[16]  The parties debate at great length the issue of insurance coverage, that is, whether Area Erectors complied with a contractual obligation to obtain insurance.  *See* Area Erectors's S.J. Brf., at 22–24 (Dckt. No. 149); Illini Hi-Reach's S.J. Brf., at 14–18, 26–30 (Dckt. No. 220); Area Erectors's Resp., at 20–22, 26–27, 31–35 (Dckt. No. 232); Illini Hi-Reach's Reply, at 6–8 (Dckt. No. 250).  Respectfully, the briefs are too jumbled for the Court to resolve that issue at this juncture.

Reach.  The Court denies Illini Hi-Reach's motion for summary judgment against JLG (Dckt. No. 178).  The Court denies the motion for summary judgment filed by Illini Hi-Reach against Area Erectors (Dckt. No. 202), and denies the motion for summary judgment filed by Area Erectors against Illini Hi-Reach (Dckt. No. 147).

Date:   July 2, 2020

_____

Steven C. Seeger
United States District Judge