**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| PATRICK R. WILDA, individually, and as independent administrator of the ESTATE OF PATRICK C. WILDA, deceased, | ) ) ) ) ) | |
| Plaintiff, | ) ) | Case No. 16-cv-10088 |
| v. | ) ) | Hon. Steven C. Seeger |
| JLG INDUSTRIES, INC., | ) ) | |
| Defendant. | ) ) | |
| ———————————————— | ) | |
| JLG INDUSTRIES, INC., | ) ) | |
| Third-Party Plaintiff, | ) ) | |
| v. | ) ) | |
| ILLINI HI-REACH, INC., | ) ) | |
| Third-Party Defendant. | ) ) | |
| ———————————————— | ) | |
| ILLINI HI-REACH, INC., | ) ) | |
| Third-Party Plaintiff, | ) ) | |
| v. | ) ) | |
| AREA ERECTORS, INC., | ) ) | |
| Third-Party Defendant. | ) ) | |
| ———————————————— | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This case is about a fatal injury suffered while a construction worker was using a manlift.

The administrator of the decedent's estate sued the manufacturer of the manlift, Defendant JLG

Industries, Inc., advancing an assortment of strict liability and negligence claims. JLG later

moved to exclude Plaintiff's two experts who opined about the alleged design defects of the manlift. JLG moved for summary judgment, too, arguing that it has no liability as a matter of law.

JLG makes three arguments in support of its motion for summary judgment. First, JLG argues that there is no evidence of a design defect if this Court grants its *Daubert* motions and excludes the testimony of Plaintiff's two experts. Second, JLG contends that the machinery was not defective because the distributor of the equipment, Third-Party Defendant Illini Hi-Reach, Inc., elected not to use an optional safety device. Third, JLG argues that the decedent proximately caused the accident by misusing the equipment.

For the reasons stated below, the *Daubert* motions are denied,[1] and so is the motion for summary judgment.

## Background

This Court previously ruled on a collection of summary judgment motions. *See* 7/2/20 Opin. (Dckt. No. 366). The Court will assume familiarity with that opinion, including the background facts. Suffice it to say that the case is about a fatal accident involving Patrick C. Wilda, a construction worker. His father (Patrick R. Wilda) later filed suit as the administrator of the estate.

The accident happened while Wilda was on board a manlift manufactured by JLG. A manlift is a "self-propelled hydraulic personnel lift equipped with a work platform on the end of an elevating and rotating boom." *See* JLG Operation and Safety Manual, at § 4.1 (Dckt. No. 288-7). Think of it as a scaffold at the end of an articulating boom, on wheels.

---

[1] Like a ruling on a motion *in limine*, the Court's ruling on the *Daubert* motions is subject to change, including before and during trial as the evidence unfolds. And the Court addresses only the arguments in JLG's motions, too. This ruling is not a guarantee that Plaintiff's experts will be able to testify about all of the opinions disclosed in their reports.

The operator directs the machine from inside the bucket (or basket). The manual describes how it works: "The primary operator control station is in the platform. From this control station, the operator can drive and steer the machine in both forward and reverse directions. The operator can raise or lower the main or tower boom or swing the boom to the left or right. Standard boom swing is 360 degree continuous left and right of the stowed position." *Id.*

In other words, an operator uses the machine by climbing inside something that looks like a large basket at the end of a boom. From inside the work platform, a worker can raise, lower, swing, and extend the boom, giving the person the freedom to go in all sorts of directions. At first blush, a reader might not be able to picture what a manlift looks like (to see a picture, *see* Dckt. No. 288-8). But they are ubiquitous at construction sites.

JLG delivered the manlift to Illini Hi-Reach, one of its distributors. Illini Hi-Reach rents and sells aerial lift equipment. Illini Hi-Reach, in turn, rented the manlift to Area Erectors, a construction company, to use at its jobsite. Wilda was an ironworker for Area Erectors.

On January 30, 2015, Wilda climbed aboard a JLG manlift to build part of a warehouse. He elevated the platform to the roof, where he intended to bolt together cross bracings for steel joists. He was alone. No one was in sight.

Somehow, Wilda collided with a beam, which struck him from behind. Apparently, the manlift continued to push him toward the beam. He became pinned between a roof joist and the manlift's control panel – the manlift pushed him toward the beam, but the beam did not budge, forcing his body back toward the machine. He died by asphyxiation. No one witnessed the accident.

The estate filed suit against JLG (the manufacturer). JLG later sued Illini Hi-Reach (the distributor). And Illini Hi-Reach, in turn, sued Area Erectors (the employer). The current motions involve the claims brought by Plaintiff against JLG.

## Analysis

JLG moved to exclude Plaintiff's two experts under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Each of the experts disclosed opinions about the alleged design defects of the manlift. JLG, in turn, relies on the *Daubert* motions to support its motion for summary judgment. Specifically, JLG argues that Wilda cannot prove that the design was defective without expert testimony. And if the expert testimony is inadmissible, then Wilda cannot carry his burden of proof. So the Court will take up the *Daubert* motions first.

## I.    The *Daubert* Motions

The Supreme Court poured the foundation for the framework for evaluating expert testimony in *Daubert*. *See Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893 (7th Cir. 2011); *United States v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009); *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 607 (7th Cir. 2006) ("The admissibility of expert testimony is governed by Federal Rule of Evidence 702 as well as *Daubert v. Merrell Dow Pharmaceuticals, Inc.*"). "The district court is a 'gate-keeper' who determines whether proffered expert testimony is reliable and relevant before accepting a witness as an expert." *Autotech Tech. Ltd. P'ship v. Automationdirect.com*, 471 F.3d 745, 749 (7th Cir. 2006); *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147–49 (1999); *Daubert*, 509 U.S. at 589.

Under Federal Rule of Evidence 702, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:  (a) the expert's scientific, technical, or other specialized knowledge will help the

trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based

on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case." *See* Fed.

R. Evid. 702; *see also Ortiz v. City of Chicago*, 656 F.3d 523, 526 (7th Cir. 2011). "The non-

exclusive list of *Daubert* reliability factors for scientific evidence includes whether or not the

theory or technique has been (1) tested, (2) subjected to peer review and publication, (3)

analyzed for known or potential error rate, and/or is (4) generally accepted within the specific

scientific field." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 810 (7th Cir. 2012) (citing *Daubert*, 509

U.S. at 593–94).

"The goal of *Daubert* is to assure that experts employ the same 'intellectual rigor' in their

courtroom testimony as would be employed by an expert in the relevant field." *Jenkins v.

Bartlett*, 487 F.3d 482, 489 (7th Cir. 2007). "The proponent of the expert bears the burden of

demonstrating that the expert's testimony would satisfy the *Daubert* standard." *Lewis v. CITGO

Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

"Under Federal Rule of Evidence 702 and *Daubert*, the district court must engage in a

three-step analysis before admitting expert testimony. It must determine whether the witness is

qualified; whether the expert's methodology is scientifically reliable; and whether the testimony

will 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Myers v.

Illinois Cent. R.R.*, 629 F.3d 639, 644 (7th Cir. 2010) (quoting *Ervin v. Johnson & Johnson, Inc.*,

492 F.3d 901, 904 (7th Cir. 2007)). District judges possess considerable discretion in dealing

with expert testimony. *See Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990); *see

also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141–43 (1997) (holding that abuse of discretion

standard applies in reviewing district court rulings on admissibility of proposed Rule 702 opinion testimony).

JLG challenges the admissibility of the testimony of Wilda's two experts: Steven Wiker and Anthony Bond. The thrust of the argument is that neither expert can testify, consistent with the standards laid down in *Daubert*, that a design defect caused the accident. *See* JLG Mem. in Support of Mtn. re Wiker, at 1 (Dckt. No. 286) ("Plaintiff has failed to proffer a liability expert who can establish that the accident on January 30, 2015 was caused by a defect in the JLG 460SJ Boom Lift . . . ."); JLG Mem. in Support of Mtn. re Bond, at 1 (Dckt. No. 284) (same).

JLG does not challenge the qualifications of either expert.[2] JLG also does not deny that the testimony would assist the trier of fact and address a fact at issue. Instead, JLG argues that their opinions are not reliable. The Court will address each expert separately.

### A.    Steven Wiker

JLG challenges the admissibility of Wiker's testimony because, in its view, the opinions are "pure speculation," "baseless," "incorrect," "nonsensical," and "inaccurate." *See* JLG Mem. in Support of Mtn. re Wiker, at 7, 8, 9, 11 (Dckt. No. 286). In reality, the *Daubert* motion is simply a smattering of arguments that are best left for a jury.

As the gatekeeper, a district court must ensure that a proposed expert follows a "scientifically valid" methodology. *See Daubert*, 509 U.S. at 592–93. The conclusions must rest on "sufficient facts or data," too. *See* Fed. R. Evid. 702(b). So, a failure to look at this or that is not a reason to keep an expert out of a case, unless the materials that an expert reviewed are "[in]sufficient" without it. *Id.*; *see also In re Fluidmaster, Inc., Water Connector Components*

---

[2]  At one point, JLG points out that Wiker never served on a committee of the American National Standards Institute ("ANSI"), and never made a submission to an ANSI committee. *See* JLG Mem. in Support of Mtn. re Wiker, at 7 (Dckt. No. 286). But JLG stops short of arguing that he is unqualified to testify within the meaning of *Daubert*.

6

*Prod. Liab. Litig.*, 2017 WL 1196990, at *22 (N.D. Ill. 2017) ("Absent a significant link to the reliability of the expert's methodology, [failure to consider other factors] is plainly a matter for cross-examination, not a basis for exclusion."); *Phillips v. Raymond Corp.*, 364 F. Supp. 2d 730, 745 (N.D. Ill. 2005) ("[Plaintiff's] quarrels with [expert's] inclusion or rejection of certain factors or calculations (such as grip strength), implicate his conclusions and are thus properly left for exploration through cross-examination.").

"[T]he test of reliability is flexible, and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho*, 526 U.S. at 141 (internal quotation marks omitted). "Rather, the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." *Id.* at 142 (emphasis omitted); *see also Pansier*, 576 F.3d at 737 (noting that the Seventh Circuit "give[s] the [district] court great latitude in determining not only how to measure the reliability of the proposed expert testimony but also whether the testimony is, in fact, reliable") (emphasis omitted) (citing *Jenkins*, 487 F.3d at 489); *Lewis*, 561 F.3d at 704 ("[T]he law grants the district court great discretion regarding the manner in which it conducts that [*Daubert*] evaluation.") (citation omitted).

A district court is the gatekeeper, and "the key to the gate is not the ultimate correctness of the expert's conclusions. Instead, it is the soundness and care with which the expert arrived at her opinion." *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013). A district court's "focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595.

However, as the Supreme Court has recognized, "conclusions and methodology are not entirely distinct from one another," and while "[t]rained experts commonly extrapolate from

7

existing data[,] . . . nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec.*, 522 U.S. at 146. "An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process." *Wendler & Ezra, P.C. v. Am. Int'l Grp., Inc.*, 521 F.3d 790, 791 (7th Cir. 2008) (citation omitted). Expert testimony cannot rest on "because I said so."

In short, it is "critical under Rule 702 that there be a link between the facts or data the expert has worked with and the conclusion the expert's testimony is intended to support." *United States v. Mamah*, 332 F.3d 475, 478 (7th Cir. 2003). When that link is missing, a court "may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec.*, 522 U.S. at 146.

A district court also must exclude "'subjective belief or unsupported speculation' by considering 'whether the testimony has been subjected to the scientific method.'" *Clark v. Takata Corp.*, 192 F.3d 750, 757 (7th Cir. 1999) (quoting *Wintz v. Northrop Corp.*, 110 F.3d 508, 512 (7th Cir. 1997)); *see also Smith v. Union Pac. R.R.*, 2017 WL 2656583, at \*5 (N.D. Ill. 2017) ("[A]n expert must substantiate his opinion, and not simply provide the ultimate conclusion without analysis."). Experts must show their work – they cannot simply offer raw conclusions.

But a *Daubert* motion is not the time or the place to make arguments best left for a jury. "So long as the principles and methodology reflect reliable scientific practice, '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Schultz*, 721 F.3d at 431 (quoting *Daubert*, 509 U.S. at 596). A *Daubert* motion is not a substitute for

impeachment, so long as the expert is sufficiently reliable to walk through the gate of the courthouse.

In his report, Wiker disclosed opinions about the "how" and the "why" of the accident. "The purpose of the analysis was to determine how the accident occurred, why it occurred, and whether it could have been reasonably prevented by established design principles that could have been economically- and technically-integrated into the design." *See* Wiker Report, at 2 (Dckt. No. 286-1, at 8 of 115). He addressed "whether there are relevant design defects that caused or contributed to a foreseeable risk of operator injury and death of the nature experienced by Mr. Wilda, and how Mr. Wilda's death could have been prevented." *Id.*

Wiker ultimately opined that the fatal accident stemmed from three "root causes." *Id.* at 42–43. First, JLG failed to physically guard the operator of the manlift from a potential collision. A mechanical guard or "cage" would have prevented an injury. And an optional safety feature called "SkyGuard" (as discussed below) would have saved Wilda's life. Second, JLG failed to use appropriate human-machine interface design standards. For example, the placement of the control joystick was all wrong. When Wilda's torso was pressed against the joystick, his body "would have acted to push the joystick away from the operator (causing the ground unit to continue to move into the joist) and blocked reverse movement of the joystick due to body interference." *Id.* at 31. So Wilda was pinned against the joystick, which pinned him even more and prevented him from moving the joystick in the opposite direction and saving himself. Third, JLG did not follow an appropriate engineering design development process.

In addition, Wiker opined that other contributing factors could have reduced the possibility of an accident. *Id.* at 43–47. For example, in his view, JLG failed to follow standard

safety engineering practices, failed to respond to a history of accidents, and failed to account for the excessive mental workload that the equipment imposed on operators. *Id.*

Critically for purposes of JLG's motion, Wiker reached these conclusions after considering the design of the JLG boom lift at issue, the design of SkyGuard, the design of similar products from other manufacturers, information about training materials for the product, and information about engineering design and safety standards. *Id.* at 11–22. His methodology involved review of various design, training, and safety materials and an evaluation of those materials in light of his industry expertise (which, recall, JLG does not dispute). To justify excluding Wiker, JLG would need to point to some fatal flaw in this process that renders the opinions unreliable. Merely disagreeing with the conclusions is not enough.

JLG offers a collection of arguments against the admissibility of Wiker's testimony. But truth be told, they aren't really *Daubert* arguments. JLG attempts to poke holes in the opinions by claiming that Wiker failed to review this, or neglected to consider that. The arguments are the stuff of cross examination, not a *Daubert* motion. Instead of asking this Court to serve as a gatekeeper, JLG is asking this Court to serve as a juror.

For example, JLG argues that Wiker failed to review "key materials" about the design of the boom lift. According to JLG, Wiker reviewed the JLG Operator and Safety Manual and the AEM Safety Manual, but never reviewed the design drawings or a few other manuals. *See* JLG Mem. in Support of Mtn. re Wiker, at 7 (Dckt. No. 286).

Maybe so. But JLG never explains why reviewing those materials was a *sine qua non* for any opinion about the design. JLG simply points at what Wiker failed to review, and then jumps to the conclusion that his opinion is "pure speculation." *Id.* That is a leap too far. The premise of the argument is that reviewing those materials is essential, but JLG never explains why.

10

Without a showing that reviewing those materials is critical, the proper audience for this type of argument is the jury at closing argument, not the Court at the *Daubert* stage. At trial, JLG could try to undermine Wiker's credibility by pointing to what he did not review, and try to score points with the jury. But it will have to wait.

Sometimes expert reports rest on nothing more than the *ipse dixit* of the expert. But here, the shoe is on the other foot. The *Daubert* motion rests on the *ipse dixit* of the party making the *Daubert* motion. JLG faults Wiker for failure to review certain materials, but never explains why it matters.

As a second example, JLG makes a two-paragraphs-long argument about SkyGuard. By way of background, SkyGuard is a safety device that was an optional feature at the time of the accident in 2015. *See* Pl.'s Resp. to Def.'s Rule 56.1 Statement, at ¶ 33 (Dckt. No. 309). It became standard equipment on all JLG boom lifts in 2017. *Id.* at ¶ 34. A picture of SkyGuard is in the record. *Id.* at ¶ 27; *see also* Bond Report, at 9, 11 (Dckt. No. 284-1, at 10, 12 of 53).

SkyGuard includes a bar that detects when it comes into contact with the operator – say, when the operator is pushed against it. When SkyGuard detects pressure, the manlift stops moving, and then moves in the other direction. (The concept seems similar to a sensor for a garage door, which makes the door change directions when something is in the way. But SkyGuard involves physical pressure, not a laser-like sensor for a garage door.)

The parties agreed on the following description of SkyGuard: "SkyGuard is a bar that goes across the front of the platform control station on a boom lift. The SkyGuard assembly is equipped with a 'tape switch' that senses force against the yellow colored area in the photograph below. [A picture appeared in the filing.] When sufficient force is sensed by SkyGuard, the tape switch automatically stops the function being used and reverses the last function, essentially

11

moving the platform away from whatever created the force against the SkyGuard tape switch." *See* Pl.'s Resp. to Def.'s Rule 56.1 Statement, at ¶ 26 (Dckt. No. 309)

According to JLG, Wiker acknowledged at deposition that Illini Hi-Reach (the distributor) had SkyGuard available as optional equipment, but didn't install it on the manlift that it rented to Area Erectors. *See* JLG Mem. in Support of Mtn. re Wiker, at 8 (Dckt. No. 286). Maybe so. But that's hardly an argument that should preclude an expert from testifying. The expert can testify that the product is defective without the protections offered by SkyGuard.

Plaintiff's position, supported by Wiker, appears to be that the manlift was defective because the standard features did not have the built-in safety that SkyGuard offered. The accessory was important to safety – and without the safety feature, the product was unsafe. So it should have been standard. The fact that a critical safety feature was merely *optional* shows that the machinery was defective without it. (Or so the argument goes.) That theory may or may not pan out, but JLG has not made a *Daubert*-based argument for keeping it from the jury.

As another example, JLG argues that Wiker got tripped up on the availability of training. Wiker opined that "JLG provided no operator training syllabi, training materials, [or] a formal training program for customers in the field. Nor did they provide any testing or knowledge gained or gaps in requisite knowledge." *See* Wiker Report, at 46 (Dckt. No. 286-1, at 52 of 115).

JLG latches on to that paragraph in a 49-page report, insisting that Wiker got it wrong. JLG points to testimony from Wiker where he acknowledged that he didn't see any training materials. *See* JLG Mem. in Support of Mtn. re Wiker, at 9 (Dckt. No. 286). JLG seems to be arguing that it *did*, in fact, have training materials, but Wilda never asked for them during discovery. *Id.* at 10. JLG points to testimony from a person who helped develop training

programs. And Wiker could have found the training materials if he had done a "modicum of research" and looked on JLG's website. *Id.*

So, according to JLG, Wiker wasn't aware of training materials, but they did, in fact, exist. Whatever value that argument may have, it is fodder for cross examination, at best. It is not an argument to prevent Wiker from testifying about training.

The remaining arguments are more of the same. JLG contends that Wiker's opinions about warning labels are "pure speculation" because he did not review any "design documents for the warning placards." *Id.* at 11. But JLG never supports the key premise – that an expert cannot testify about the placement of warning labels without reviewing the design documents.

As a final example, JLG argues that Wiker made "many inaccurate statements" about the drive orientation of the boom lift, and flubbed the topic so badly that "he does not understand how it works." *Id.* JLG then pastes into its brief six passages from the Operation and Safety Manual, and then quotes ten passages from Wiker's report and rebuttal report, plus four pages from his deposition. *See id.* at 11–16. JLG does not muster much of an explanation of how Wiker's opinions are inconsistent with the Manual – it simply strings together a bunch of quotes. Maybe the point will resonate with the jury, but for present purposes, the inconsistency does not leap off the page.

In the introduction of its brief, JLG faults Wiker for failing to test his theories. *Id.* at 1. But when the time comes, the argument section of the brief makes no mention of testing. The introduction also criticizes Wiker for lacking a "reliable scientific methodology." *Id.* But the balance of its brief does not address the methodology, either. Instead, the brief faults Wiker for failing to review certain materials, and for failing to get certain facts right. In the end, the

arguments are run-of-the-mill points to make during cross examination, not punches that could knock an expert out of a case.

### B.     Anthony Bond

JLG also moved to exclude the testimony of Anthony Bond, another design expert.  The arguments are the same song, different verse.  Once again, JLG argues that the expert's opinions are "pure speculation," "nonsensical," "speculative," "irrelevant," "contradictory," and "inaccurate."  *See* JLG Mem. in Support of Mtn. re Bond, at 2, 8, 10 (Dckt. No. 284).

In his report, Bond offered opinions after inspecting the manlift involved in the accident. *See* Bond Report (Dckt. No. 284-1).  Bond summarized the facts surrounding the accident, and then discussed various safety standards for machines.  Bond then opined about design changes that could have eliminated the crushing (entrapment) hazard associated with involuntary operation of the equipment.  Here, too, Bond's methodology was to consider this evidence and generate conclusions about the accident's cause(s) in light of his expertise.

In the end, Bond offered four conclusions (some of which blur together).  *Id.* at 20 (Dckt. No. 284-1, at 21 of 53).  First, Wilda was entrapped against a roof structure, causing his death. Second, the manufacturer (JLG) had the responsibility to design the boom lift in compliance with industry safety standards.[3]  Third, JLG failed to eliminate the entrapment (crushing) hazard associated with the manlift.  JLG could have prevented the accident by designing a different platform control station for the boom lift, or by installing the SkyGuard safety device.  Fourth, JLG failed to design the boom lift "in accordance with industry standards and guideline[s] to

---

[3]  For now, the Court construes that opinion as a statement about industry standards, not a statement about legal responsibility.  The Court may revisit that opinion at a later time.  Experts cannot offer legal conclusions.  *See Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003).

eliminate entrapment (crushing) hazards associated with sustained involuntary operation of the platform controls." *Id.*

JLG attempts to poke holes in Bond's testimony. First, JLG argues that Bond's opinions about industry standards are "pure speculation." *See* JLG Mem. in Support of Mtn. re Bond, at 8 (Dckt. No. 284). JLG points to deposition testimony where Bond admitted that ANSI A92.5-2006 – which JLG declares is the "applicable industry standard" – is not specific about the design of the platform and the platform control station. *Id.* Bond testified that he considered the ANSI standards, but they "aren't that specific as far as how to design the area around the control panel in the platform." *See* Bond Dep., at 18:23 – 19:1 (Dckt. No. 284-2); *see also id.* at 149–50.

But JLG offers no support for the notion that ANSI A92.5-2006 is the only applicable industry standard. And, as the surrounding testimony makes clear, Bond relied on industry standards from the National Safety Council and from the ISO. *See id.* at 150:3-10; *see also* Bond Report, at 12–14 (Dckt. No. 284-1, at 13–15 of 53). If the ANSI standard is the only standard in town, JLG never explains why.

JLG's expert apparently relied on the ANSI standard. *See* JLG Mem. in Support of Mtn. re Bond, at 9 (Dckt. No. 284). So, the experts have different opinions on what standard is the governing industry standard. A difference of opinion is not a reason to preclude an expert from offering an opinion. It's a reason why a jury needs to hear the opinions. The jury can sort it out.

Second, JLG argues that Bond's opinions about SkyGuard are inconsistent with his personal experience. Bond worked for another boom manufacturer for 14 years, and was responsible for safety of the platforms. *Id.* But that manufacturer did not have a device like

SkyGuard protecting the control panel. *Id.* So the argument seems to be that Bond didn't walk the walk.

Maybe so, but that is neither here nor there. If JLG wants to impeach Bond by pointing to his personal experience, JLG can go right ahead. But his work history is not a reason to prevent the jury from hearing his testimony.

Third, JLG takes issue with Bond's opinion that competitors make machinery with protections against involuntary operation. *Id.* at 10. JLG complains that Bond offered no "scientific foundation" for his opinion. *Id.* But Bond testified that he has "been involved in inspecting these pieces of equipment for the last decade." *See* Bond Dep., at 47:1-9 (Dckt. No. 284-2). And he testified that such safety protections were standard. *Id.* at 47:14-21. That testimony is fair game. An expert can rely on professional experience to establish a standard of care. *See, e.g.*, *Sam's Wines & Liquors, Inc. v. Wal-Mart Stores, Inc.*, 1994 WL 529331, at *11 (N.D. Ill. 1994) (explaining that "courts normally admit expert opinions based on industry experience even in the absence of supporting scientific data").

JLG thinks that Bond is mistaken. JLG declares that he has "no actual basis" for that statement and that he is "[c]learly . . . speculating." *See* JLG Mem. in Support of Mtn. re Bond, at 11 (Dckt. No. 284). But Bond testified about the basis for his statement – 14 years of experience in the industry. JLG can try to stump Bond on the stand by forcing him to give examples. Or, JLG is free to offer its own testimony at trial. But in the meantime, simply declaring that an expert is wrong, without more, is not a reason to keep an expert off the witness stand.

Finally, JLG declares that Bond made "many inaccurate statements" about the boom lift's drive orientation. *Id.* at 11. As JLG sees it, Bond "does not understand how it works." *Id.*

The gist seems to be that the controls work a certain way when the boom is positioned over the rear axle. But when the boom is flipped around, and the boom is over the front axle, then the controls are reversed, too. (For example, as the Court understands it, for the joystick, right would be become left, and left would become right, because the operator would be facing the opposite direction. The Court assumes that the boom rotates. So, the boom could be over the front axle, and then the operator could spin it around, so that the boom is over the back axle.)

To expose Bond's lack of understanding, JLG then points to six passages from the Operation and Safety Manual. For example, one passage forewarned: "Both drive and steer functions work in the opposite direction when the boom is positioned over front of the chassis." *Id.* at 12.

On this critique, JLG takes issue with only one passage of Bond's report. Bond stated that the "boom was positioned over the steer wheels, which indicated that the steer/drive joystick would operate in the opposite (reverse) direction than when the boom was positioned over the drive wheels." *Id.* at 14. It's not immediately obvious how that passage is inconsistent with the Manual. If anything, it seems consistent with a warning in the Manual, as quoted in the preceding page of JLG's motion: "IF BOOM IS OVER FRONT AXLE (STEER WHEELS), STEER AND DRIVE CONTROLS WILL MOVE IN OPPOSITE DIRECTION THAN INDICATED ON MACHINE PLACARDS." *Id.* at 13 (all caps in original).

Again, if there's a point to be made, it does not jump off the page. And it is hardly the stuff of a *Daubert* motion. JLG quotes the rebuttal report of its expert, but it is not nearly enough to knock Bond out of the case. In conclusory fashion, JLG's rebuttal expert opined that Bond has a "significant lack of understanding of the functionality of the operation of the lift." *Id.* at 15. The jury will decide if the rebuttal expert is right.

17

## II.     The Motion for Summary Judgment

In addition to challenging Wilda's experts, JLG filed a motion for summary judgment. Rule 56 provides that the Court "shall grant" summary judgment when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A genuine dispute about a material fact exists if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law controls which facts are material. *Id.* After a "properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 250 (internal quotations omitted).

The Court "'consider[s] all of the evidence in the record in the light most favorable to the non-moving party, and [ ] draw[s] all reasonable inferences from that evidence in favor of the party opposing summary judgment.'" *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (citation omitted). The Court gives the non-moving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in [its] favor." *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id.*

Wilda's complaint includes claims against JLG for both strict liability and negligence. *See* Third Am. Cplt., Counts XIX – XXII (Dckt. No. 1-2). "In both strict liability and negligence actions regarding design, Illinois law . . . requires plaintiffs to establish 'the existence of a defective condition in the product at the time it left the manufacturer's control' and 'a causal link

between the alleged design defect . . . and [the plaintiff's] injury.'" *See Fuesting v. Zimmer, Inc.*, 421 F.3d 528, 532 (7th Cir. 2005) (vacated on other grounds by *Fuesting v. Zimmer, Inc.*, 448 F.3d 936 (7th Cir. 2006)) (internal citations omitted).

In its motion, JLG did not specify whether it was moving for summary judgment on some or all of the claims. JLG did not tie or tailor its arguments to specific Counts in the complaint. Instead, JLG simply asked that the Court grants its motion "in its entirety." *See* Mtn. for S.J. (Dckt. No. 287). So, JLG wants its motion granted, but it is not entirely clear what it is moving *for*.

The word "negligence" never appears in JLG's supporting brief. But JLG did mention the strict liability claims. So the Court construes the motion as a request for summary judgment on the strict liability claims.

JLG advances three arguments in support of its motion. The first argument is about the experts. The second is about the availability of SkyGuard. And the third is about Wilda's alleged misuse of the equipment.

## A.    The Experts

JLG's first argument is about the expert testimony. JLG argues that it is "well-settled that expert testimony is required to prove a defect in a complex products liability action because the issues involve questions beyond the field of ordinary knowledge and experiences of jurors." *See* JLG S.J. Mem., at 1 (Dckt. No. 319); *see also Show v. Ford Motor Co.*, 659 F.3d 584 (7th Cir. 2011) (addressing the need for expert testimony to prove a design defect under the consumer-expectations approach, one of two ways to prove a design defect under Illinois law).

JLG contends that Wilda cannot carry its burden of proof because the expert testimony is inadmissible. But this Court has now denied JLG's *Daubert* motions, so the Court rejects JLG's first summary judgment argument, too.

### B. Optional Safety Equipment

The next argument involves SkyGuard, a piece of optional safety equipment that JLG manufactured. Illini Hi-Reach (again, the distributor) owned SkyGuard and could have installed it on the manlift that it rented to Area Erectors. But for whatever reason, Illini Hi-Reach declined to use it. The question is whether the availability of an optional safety device forecloses the liability of the manufacturer.

Under Illinois law, a manufacturer has a duty to make products that are not unreasonably dangerous. *See Rios v. Niagara Mach. & Tool Works*, 59 Ill. 2d 79, 319 N.E.2d 232, 235 (Ill. 1974) (explaining a manufacturer's "duty to produce a product which is reasonably safe"). The availability of optional safety equipment can play a role in either side's theory of the case in a strict liability claim.[4]

---

[4] *See generally* 2 Neil A. Goldberg, *Products Liability Practice Guide* § 15.14 (2020) (entitled "Failure to Purchase Optional Safety Device") ("A significant modern trend in products liability law is a defense that relieves a manufacturer of liability if it can show that available safety devices for a product capable of multiple uses were rejected by a ***knowledgeable*** buyer.") (emphasis in original); 1 David G. Owen & Mary J. Davis, *Owen & Davis on Products Liability* § 8.23 (4th ed. 2020) (describing "two lines" of authority about optional safety devices) ("Whether such a claim may lie is a question that has confounded courts and commentators."); James A. Henderson, Jr. & Aaron D. Twerski, *Optional Safety Devices: Delegating Product Design Responsibility to the Market*, 45 Ariz. St. L.J. 1399, 1414–23 (2013) (summarizing the case law about optional safety devices); Richard C. Ausness, *Risky Business: Liability of Product Sellers Who Offer Safety Devices as Optional Equipment*, 39 Hofstra L. Rev. 807, 828–40 (2011) (same); Richard G. Stuhan & Charles W. Pugh, *Finding Middle Ground: Reconciling the Disparate Approaches Courts Have Taken in Determining Liability when a Purchaser Declines Optional Safety Equipment*, 77 Def. Counsel J. 11 (Jan. 2010) (characterizing the two approaches as "seller's duty" vs. "buyer's choice"); Paul Scrudato, *Should Product Safety Be an Option?*, 37 Trial Magazine 42 (Nov. 2001) (noting that courts "use two principal theories to address optional-equipment cases," and that "neither is particularly easy to understand or apply in practice").

Sometimes a plaintiff will argue that a product is unreasonably dangerous because the manufacturer failed to include a safety feature that should have been standard, not optional. *See Romero v. Cincinnati Inc.*, 171 F.3d 1091, 1094 (7th Cir. 1999) ("The failure to provide a necessary safety device . . . can render a product unreasonably dangerous.") (applying Illinois law); *Stanfield v. Medalist Indus., Inc.*, 34 Ill. App. 3d 635, 340 N.E.2d 276, 279 (1975) ("A product may be considered unreasonably dangerous for failure to adopt any and all safety devices, the absence of which would render the product not reasonably safe for its intended use."); *see also* 63A Am. Jur. 2d *Products Liability* § 906 (2d ed. 2020) ("The failure to incorporate into a product an optional safety feature or device may constitute a defective condition of the product, such as where the product, without the safety device[,] creates an unreasonable risk of harm, and the safety device can feasibly be installed by the manufacturer.") (citing Illinois law).

A prominent example is *Bexiga v. Havir Mfg. Corp.*, 60 N.J. 402, 290 A.2d 281 (1972); *see also Rios*, 59 Ill. 2d at 85 (endorsing *Bexiga*). There, a 10-ton punch press crushed the plaintiff's hand, and the plaintiff claimed that the press should have included more safety features. *Id.* The Supreme Court of New Jersey allowed the plaintiff to argue that the absence of a safety device rendered the press unreasonably dangerous. *See Bexiga*, 290 A.2d at 285 ("We hold that where there is an unreasonable risk of harm to the user of a machine which has no protective safety device, as here, the jury may infer that the machine was defective in design unless it finds that the incorporation by the manufacturer of a safety device would render the machine unusable for its intended purposes."). So, the existence of optional safety equipment can be a sword – that is, a reason to impose liability.

But other times, a defendant will point to the availability of optional safety equipment as a defense to liability. That is, sometimes a defendant will argue that the customer could have chosen to use optional safety equipment. And the decision not to use that equipment means that there is no liability.

A good example is *Parks v. Ariens Co.*, 829 F.3d 655 (8th Cir. 2016). There, the manufacturer of a riding lawnmower escaped liability because the customer failed to purchase a rollover protection system, and that optional safety equipment would have prevented the injury. *Id.* at 657–58 (adopting the "doctrine that a manufacturer is, under certain circumstances, not negligent if a purchaser fails to buy optional safety equipment that would have prevented the accident"); *see also Biss v. Tenneco, Inc.*, 64 A.D.2d 204, 409 N.Y.S.2d 874 (1978). Some states allow that defense, but others do not. *See, e.g., Caterpillar Tractor Co. v. Ford*, 406 So. 2d 854 (Ala. 1981) ("If the tractor was defective in the condition in which it was sold, liability for resulting injury cannot be escaped by showing that the customer could have but did not buy an item which would have removed the defect."). So, the existence of optional safety equipment can be a shield – that is, a defense to liability.

This case involves both theories. Wilda argues that the manlift should have included SkyGuard as a standard feature. In Plaintiff's view, the failure to include that protection means that the product was unreasonably dangerous without it. On the flipside, JLG argues that the distributor (Illini Hi-Reach) could have used SkyGuard on the manlift that it rented to Area Erectors. So, JLG argues that it is not liable because it made optional safety equipment available to the end user.

Only JLG moved for summary judgment based on its theory of the case. Wilda did not move for summary judgment based on the notion that SkyGuard should have been a standard

22

part of the manlift. Wilda likely realized that it is often a question of fact for the jury whether a product is unreasonably dangerous without additional safety protections. *See Mahoney v. Roper-Wright Mfg. Co., Inc.*, 490 F.2d 229, 233 (7th Cir. 1973) ("Whether a defendant's product is unreasonably dangerous for failure to incorporate certain available safety devices is a question to be decided by the jury in these kinds of cases.").

But JLG did rely on SkyGuard in its motion for summary judgment. That is, JLG argues that it is entitled to judgment as a matter of law because it is undisputed that SkyGuard was an available safety feature and that the distributor declined to use it. So the question is whether the availability of SkyGuard means that JLG is entitled to judgment as a matter of law. Before digging in, the Court starts with first principles.

To prevail on a strict product liability claim, a plaintiff must show that a product was "unreasonably dangerous" when it left the manufacturer's control. *See Mikolajczyk v. Ford Motor Co.*, 231 Ill. 2d 516, 327 Ill. Dec. 1, 901 N.E.2d 329, 335 (2008) ("It has . . . been well established that to recover in a strict product liability action, a plaintiff must plead and prove that the injury complained of resulted from a condition of the product, that the condition was unreasonably dangerous, and that it existed at the time the product left the manufacturer's control."); *see also Hakim v. Safariland, LLC*, 410 F. Supp. 3d 862, 869 (N.D. Ill. 2019) (same).

Under Illinois law, the manufacturer cannot delegate the duty to ensure that its product is not unreasonably dangerous. The duty rests on the manufacturer. *See Blaue v. Kissinger*, 2006 WL 2092380, at *5 (N.D. Ill. 2006) ("The law of strict product liability imposes upon manufacturers a nondelegable duty to make products that are reasonably safe."); *Winters v. Fru-Con Inc.*, 498 F.3d 734, 744 (7th Cir. 2007) ("A manufacturer has a nondelegable duty to

produce a product that is reasonably safe for all intended uses.") (quoting *Hansen v. Baxter Healthcare Corp.*, 198 Ill. 2d 420, 261 Ill. Dec. 744, 764 N.E.2d 35, 43 (2002)).

In particular, the manufacturer cannot delegate its duty to someone down the chain of commerce, such as a distributor or a consumer. *See Rios*, 319 N.E.2d at 235 (agreeing that a manufacturer's duty is "nondelegable"); *see also id.* at 235 ("It has been recognized by other jurisdictions that one who markets an unreasonably dangerous product is not entitled to expect that others will make it safe."); *Malone v. BIC Corp.*, 789 F. Supp. 939, 941 (N.D. Ill. 1992) ("A seller who places his product in the stream of commerce has a non-delegable duty to make sure his product is reasonably safe."); *Polson v. Cottrell, Inc.*, 2005 WL 8173655, at *4 (S.D. Ill. 2005) ("A manufacturer's obligation to manufacture and sell a product which is not unreasonably dangerous cannot be delegated, so it is not a defense to the manufacturer that another person, including the claimant's employer failed to make it free from unreasonably dangerous conditions."). The duty to make a safe product rests with the manufacturer, and a manufacturer cannot simply assume that distributors or end users will make a product safe down the road.

JLG argues that the availability of optional safety equipment means that the manufacturer has no liability if the equipment would have prevented the injury. But JLG offers no Illinois authority for the notion that the existence of optional safety equipment is a get-out-of-liability-free card for a manufacturer.

If anything, the current of Illinois law seems to flow in the other direction. The duty to ensure that the product is free of unreasonable dangers rests with the manufacturer. The product must be free of unreasonable dangers when it leaves the manufacturer and arrives in the hands of the end user. And the manufacturer cannot shift that obligation to someone else. *See Rios*, 319

24

N.E.2d at 235. So the end user cannot be responsible for fixing dangers. A defense based on the availability of an optional safety device would, in effect, pass the duty to fix a danger from the manufacturer to the end user, and thus stand Illinois law on its head.

Other states allow manufacturers to limit their liability based on optional safety devices. Illinois emphasizes a manufacturer's non-delegable duty to make products safe, but some states emphasize the role played by distributors and end users to make products safe for particular uses. *See, e.g.*, 1 David G. Owen & Mary J. Davis, *Owen & Davis on Products Liability* § 8.23 (4th ed. 2020) ("It often is asserted that there are two lines of conflicting authority on the optional safety device issue: one holding that a manufacturer cannot delegate important safety decisions to consumers and another holding that a manufacturer has no duty to equip its products with mandatory safety features if consumers are informed of the availability of such devices as optional equipment."); *see also id.* (adding that the "classification has some value," but "glosses over variations in the decisions and ignores the frequent overlap," and that the "law in this area is muddled and quite sparse").

A prominent example of the competing approach is *Scarangella v. Thomas Built Buses, Inc.*, 717 N.E.2d 679 (1999). There, the Court of Appeals of New York applied a three-part test for evaluating when the availability of optional safety equipment limits a manufacturer's liability. A product is not defective if a manufacturer can show: "(1) the buyer is thoroughly knowledgeable regarding the product and its use and is actually aware that the safety feature is available; (2) there exist normal circumstances of use in which the product is not unreasonably dangerous without the optional equipment; and (3) the buyer is in a position, given the range of uses of the product, to balance the benefits and the risks of not having the safety device in the specifically contemplated circumstances of the *buyer's* use of the product." *Id.* at 683 (emphasis

in original); *see also Parks*, 829 F.3d at 660 (applying the *Scarangella* test under Iowa law). So, an informed choice by the end user can limit the manufacturer's liability.

But for present purposes, *Scarangella* does not lend a hand. JLG makes no showing that Illinois law follows that approach. And even if it did, JLG has not demonstrated the absence of factual issues that would entitle it to summary judgment. If anything, the three-part test is rife with questions of fact. It would require JLG to show what the buyer knew, and whether the end user was in a position to balances the benefits and risks, and so on.

There is a wrinkle in cases about optional safety equipment when a product has more than one potential use. Sometimes a product has a number of uses, and an optional safety device might make sense for some uses and not others. In fact, sometimes an optional safety device might be worse than unnecessary – sometimes an optional safety device might *get in the way*.

Imagine, for example, if a tractor had an anti-rollover bar as an accessory. For farmers working on rolling hills, the added protection might make sense. But that accessory might make the tractor too tall when, say, driving under low-hanging fruit trees or in a barn with a low overhead clearance. So, the anti-rollover bar might make sense some of the time, but not all of the time. It depends on the use. The key point is that it's possible to have an optional safety device that makes sense for some uses, but not others.

Under Illinois law, a jury can take into account the potential uses of the product and the presence of optional safety devices when deciding whether a product is unreasonably dangerous. *See, e.g.*, *Turney v. Ford Motor Co.*, 94 Ill. App. 3d 678, 50 Ill. Dec. 85, 418 N.E.2d 1079, 1083 (1981) ("Evidence of the multifunctional nature of a product is admissible and is a factor *for the trier of fact* to consider in determining whether a product is unreasonably dangerous.") (emphasis added); *Doser v. Savage Mfg. and Sales, Inc.*, 142 Ill. 2d 176, 154 Ill. Dec. 593, 568 N.E.2d 814,

26

824 (1999) ("The multifunctional character [of a product] . . . was one factor the jury could consider in determining whether the press was unreasonably dangerous."); *Ruegger v. Int'l Harvester Co.*, 216 Ill. App. 3d 121, 159 Ill. Dec. 619, 576 N.E.2d 288, 290–91 (1991) (considering multiple potential uses for a truck cab when deciding whether a device should have come as standard equipment on the cab); *Scott v. Dreis & Krump Mfg. Co.*, 26 Ill. App. 3d 971, 326 N.E.2d 74, 84 (1975) ("Although the multifunctional nature of a product is one factor to be considered by the trier of fact in determining whether the product is unreasonably dangerous, it does not operate to delegate the duty of a manufacturer to the conduct of third parties.").

But that law doesn't lend JLG much of a hand. As a factual matter, JLG does not support the notion that the manlift had multiple uses. According to JLG's brief, "Plaintiff's own experts conceded that boom lifts are multifunctional," but the cited passage says nothing of the sort. *See* JLG S.J. Mem., at 10–11 (Dckt. No. 319). JLG relies on paragraph 78 of its statement of facts, but that paragraph addressed whether the decedent used the manlift as intended. *See* Def.'s Rule 56.1 Statement, at ¶ 78 (Dckt. No. 288) ("It is Bond's opinion that operators of JLG equipment have the responsibility to use the equipment as intended by the manufacturer, and that here, Decedent was *not* using the Boom Lift as intended by JLG because he came into contact with obstructions.") (emphasis in original). Maybe a manlift has uses other than lifting men, and maybe SkyGuard would make sense for some uses but not others. But if so, it's not in the record.[5]

---

[5] JLG points out that the risk of crushing does not exist all the time. But JLG blurs together the concept of *risk* and the concept of *use*. That is, JLG argues that crushing isn't always a risk when using a manlift. That may be true. But the fact that a risk isn't always present does not mean that there are multiple uses. Driving a car in icy conditions might not always be a risk (especially in summertime), but that doesn't mean that there are multiple uses of a car.

JLG did not muster evidence for the notion that the manlift has multiple uses. Even if it had, it would not entitle JLG to summary judgment. A "determination of whether [a product] was multifunctional or unifunctional" is a "question of fact for the jury to resolve." *Doser*, 568 N.E.2d at 824.

Even if it were undisputed that a manlift has multiple uses, JLG wouldn't be entitled to summary judgment. A jury would need to decide if the manlift was unreasonably dangerous without SkyGuard in light of the multiple uses of the product. The existence of multiple uses would be, at best, a "factor for the trier of fact to consider in determining whether a product is unreasonably dangerous." *Turney*, 418 N.E.2d at 1083.

In the end, JLG doesn't really argue that the manlift had multiple uses, and that SkyGuard made sense for "Use X" but not "Use Y." Instead, JLG argues that Illini Hi-Reach made an informed decision not to use SkyGuard, so the responsibility for that decision (so the argument goes) is on them. *See* JLG S.J. Mem., at 10–11 (Dckt. No. 319). But that's just another way of flipping the manufacturer's duty back to the end user. And that's a delegation that Illinois law does not allow.

## C.     The Alleged Misuse of the Equipment

Finally, JLG contends that Wilda proximately caused the accident by misusing the equipment. Wilda was moving backwards in the manlift at the time of the accident, and backed into the steel beam. He was pinned – from behind – between the steel joist and the control panel. So his back was to the joist, and when they collided, the joist pushed him forward and pinned him against the control panel, causing asphyxiation.

"Misuse of a product is an accepted defense to a strict liability action." *May v. Rubbermaid*, 2002 WL 34447178, at *1 (N.D. Ill. 2002). Misuse of a product means "using it

for a purpose neither intended nor reasonably foreseeable by the defendant based upon an objective standard." *Varilek v. Mitchell Eng'g Co.*, 200 Ill. App. 3d 649, 146 Ill. Dec. 402, 558 N.E.2d 365, 377 (1990); *see also Gallee v. Sears, Roebuck & Co.*, 58 Ill. App. 3d 501, 16 Ill. Dec. 56, 374 N.E.2d 831, 834 (1978) ("The misuse of a product which will constitute a bar to an action predicated upon strict liability in tort has been objectively defined as a use for a purpose neither intended nor reasonably foreseeable by the manufacturer.").

To prove misuse, a manufacturer must establish that its product "was used for a *purpose* neither intended nor foreseeable, rather than in a *manner* neither intended nor foreseeable." *Suich v. H&B Printing Mach., Inc.*, 185 Ill. App. 3d 863, 133 Ill. Dec. 768, 541 N.E.2d 1206, 1213 (1989) (emphasis in original). That is, the "manner in which the particular purpose was being accomplished is not an issue under a theory of misuse." *Arellano v. SGL Abrasives*, 246 Ill. App. 3d 1002, 186 Ill. Dec. 891, 617 N.E.2d 130, 136 (1993).

The focus is on the purpose of the use, not the manner of the use. It boils down to what vs. how – *what* the person was using the product for, not *how* the person was using it. So, for example, using a potato peeler to tighten screws in an electrical outlet (leading to a shock) would be a misuse of the product. But holding the wrong end of the potato peeler – and cutting one's hand while peeling potatoes – would not be a misuse. How a cook holds a potato peeler while peeling potatoes goes to the manner of use, not the purpose of use, so it would not give rise to a misuse defense.

JLG argues that Wilda misused the manlift and thus proximately caused the accident for two reasons. First, JLG contends that Wilda lacked adequate training. Second, JLG argues that Wilda hit the beam because he wasn't looking where he was going.

The argument about training doesn't get JLG very far. At bottom, the argument speaks to whether Wilda used the manlift the right way. The notion is that he used the manlift incorrectly because he lacked training. So, in the end, the argument goes to the manner of use. And the manner of use is not what the misuse defense is all about. *See Suich*, 185 Ill. App. 3d 863, 133 Ill. Dec. 768, 541 N.E.2d at 1213. A lack of training does not speak to whether Wilda used the manlift for an improper purpose.

Besides, there is evidence that Wilda received on-the-job training. He shadowed another employee – for three days – to learn how to use the manlift. *See* Pl.'s Resp. to Def.'s Rule 56.1 Statement, at ¶¶ 58, 61 (Dckt. No. 309). "Decedent did receive three days of training (24 hours total) of hands on training from Area Erectors." *Id.* at ¶ 64. There is evidence that Wilda received other training, too. *Id.* at ¶¶ 61, 63, 66. To the extent that the adequacy of training is a live issue, it is an issue for the jury at trial, not the Court at summary judgment.

Second, JLG argues that it has no liability because Wilda wasn't looking where he was going when he backed into the beam. According to JLG, Wilda was looking in one direction, but was moving in another direction. So he misused the equipment because he was looking the wrong way.

But JLG does not present any evidence – let alone establish that there is no evidence on the other side of the scale – that Wilda used the machine for an unintended or unforeseeable purpose. If anything, the record shows the opposite. It is undisputed that Wilda suffered injuries while using the manlift at a construction site. He used the manlift to elevate himself to weld a beam. The use of the manlift seems to be what the manual contemplated: "Do not use the machine for any purpose *other than positioning personnel*, their tools, and equipment." *See* JLG

Operation and Safety Manual, at § 1.3 (Dckt. No. 288-7) (emphasis added). That's what Wilda was doing – positioning himself to work high above ground.

In fact, Wilda was doing exactly what the name of the product suggested: *manlift*. Using a manlift for drag racing might be an unforeseeable use. But using a manlift to lift a man at a construction site is not.

To prevail on its motion, JLG would need to show that no reasonable jury could conclude that Wilda used the manlift for its intended and foreseeable purpose. At the very least, there is a genuine issue of material fact about whether using a manlift to lift a construction worker was an intended, foreseeable purpose. There is more than enough to get to a jury on that issue. If JLG thinks that it will resonate, JLG can try its argument on the jury.

JLG's argument also goes astray because it focuses on *how* Wilda was using the product, not *what* he was using the product for. JLG doesn't argue that Wilda never should have used the manlift to raise himself to the roof of the building. Instead, JLG faults Wilda for how he operated the machine. That is, he should have looked behind him, but didn't. But again, that's the manner of use, and the manner of use is not what "misuse" means. *Suich*, 185 Ill. App. 3d 863, 133 Ill. Dec. 768, 541 N.E.2d at 1213. Otherwise, misuse would slip into contributory negligence, and contributory negligence is not a defense to strict liability. *See Arellano*, 617 N.E.2d at 137; *McGill ex rel. McGill v. Menard, Inc.*, 2013 WL 5253650, at *6 (N.D. Ill. 2013).

As a factual matter, JLG's argument runs into trouble, too. JLG argues that Wilda didn't look where he was going when he was using the equipment. *See* JLG S.J. Mem., at 11 (Dckt. No. 319) (faulting Wilda for "failing to look in the direction of travel, and failing to look out for overhead obstructions"); *see also* Def.'s Rule 56.1 Statement, at ¶ 72 (Dckt. No. 288) (faulting Wilda for "failing to look in the direction of travel, and failing to be aware of overhead

31

obstructions"); *id.* at ¶ 73 (same); *id.* at ¶ 76 (claiming that "Decedent was acting in direct contravention to JLG's warnings and instructions to always look in the direction of travel").

As support, JLG relies on the testimony of its Director of Product Safety and Reliability, Brent Hoover. He testified that "Decedent's misuse of the Boom Lift caused the accident." *See* Def.'s Rule 56.1 Statement, at ¶ 71 (Dckt. No. 288). But that's not really a fact. It's a conclusion about the facts. So it does not move the needle.

Hoover claimed that the decedent "fail[e]d to look in the direction of travel." *Id.* at ¶ 72. But Hoover wasn't there. He didn't see the accident. He has no personal knowledge about which way Wilda was looking when he struck the beam. Even if there was evidence out there, Hoover cannot simply summarize the evidence (he is not a summary witness under Rule 1006, and this fact would not qualify under Rule 1006 anyway). *See* Fed. R. Evid. 1006. He is not an expert witness, either, so he cannot opine about how the accident happened. *See* Fed. R. Evid. 702. Hoover doesn't know where Wilda was looking, so he cannot testify about it.

JLG then points to the deposition testimony of its expert, Brian Boggess. JLG did not file the expert report, so the testimony is a bit difficult to evaluate. It is unclear whether Boggess disclosed opinions in his report about which way Wilda was looking. Even if he did, Boggess was less than definitive in his deposition testimony (which JLG did not file in full) about which way Wilda was looking. He testified that the accident was consistent with Wilda looking forward, but he did not foreclose the possibility that Wilda was looking backward:

> Q:     Well, are you saying that the manner of entrapment, the physical evidence of entrapment shows that he was not looking backwards before he became entrapped?
>
> A:     *I don't think you can establish that he was not.* But again I would not – if he was looking, he would have been aware of the roof joist.

*See* Boggess Dep., at 110:4-10 (Dckt. No. 288-6, at 16 of 22) (emphasis added).

JLG then relies on the position of Wilda's body. He "was found in the basket pinned in a position that was oriented in the direction opposite from the one he was traveling." *See* Def.'s Rule 56.1 Statement, at ¶ 75 (Dckt. No. 288). As JLG interprets the scene of the accident, Wilda *must* have been looking forward – with his back to the steel joints – while backing up. The fact that he was hit from behind, and pushed forward by the beam, means that he wasn't looking behind him.

JLG's argument faces a basic problem. No one saw the accident. *See* Def.'s Rule 56.1 Statement, at ¶ 70 (Dckt. No. 288) ("There were no witnesses to the accident."). There's no video, either. Wilda's body was facing a certain direction. But no one knows which way he was looking. Maybe he was looking straight ahead as the lift moved backwards. Or maybe not.

Heads turn on a swivel. And torsos twist, too. A person can look one direction, and go the other way. A driver can operate a vehicle by going one direction and facing another. Ask any parallel parker on the streets of Chicago.

The mere fact that Wilda's body was facing a certain direction does not mean, as a matter of law, that he was looking the same way. The placement of the body might create an inference that he was looking straight ahead. But it's not a *necessary* inference. The jury could decide that Wilda was looking behind him, and hit the beam anyway. The jury can hear the evidence and decide for itself if Wilda was looking where he was going.

### Conclusion

For the foregoing reasons, JLG's motions to exclude the experts are denied, and its motion for summary judgment is denied.

Date:   February 3, 2021

_____
Steven C. Seeger
United States District Judge